## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JUST BLOCK 112, LLC and HOBOKEN
WESTERN EDGE, LLC,

                *Plaintiffs*,

        v.

MIGUEL HECTOR, LORGIA HECTOR,
ANTHONY HECTOR, UCMH TERRA
HEIGHTS, LLC, OBSERVER MH, LLC a/k/a
OBSERVERMH, LLC, 7601 MH, LLC a/k/a
7601MH, LLC, JOHN DOES 1-25, and ABC
COMPANIES 1-25,

                *Defendants.*

Civil Action No. __25-18817__

## COMPLAINT AND JURY DEMAND

Plaintiffs Just Block 112, LLC ("JB112") and Hoboken Western Edge, LLC ("HWE") (collectively, "Plaintiffs") each with offices located at 1414 Grand Street, Suite 204, Hoboken, New Jersey 07030, by and through their undersigned counsel, for their Complaint against Defendants Miguel Hector, Lorgia Hector, Anthony Hector, UCMH Terra Heights, LLC ("UCMH"), Observer MH, LLC ("Observer MH"), 7601 MH, LLC ("7601 MH"), John Does 1-25, and ABC Companies 1-25 (collectively "Defendants"), allege as follows:

### NATURE OF ACTION

1.     This action seeks to hold Defendants accountable for conspiring to maintain a persistent campaign of sham objections for the purpose of obstructing redevelopment of property in the Greater Hoboken Area of Hudson County, New Jersey.

2.     Defendants compete in the market for mixed-use developments containing multiple-dwelling rental housing in the Greater Hoboken Area, which encompasses the City of

Hoboken ("Hoboken") and surrounding municipalities in Northern New Jersey in close proximity to the Hudson River and New York City.  To privilege their own properties and block entry of new competing mixed-use developments with a large component of multiple-dwelling rental housing into the market, Defendants have collaborated and formed an agreement among themselves to use pretextual objections and frivolous litigation to obstruct redevelopment projects in the Western Edge Redevelopment Area of Hoboken.

3.    As understood by Defendants when forming their agreement to obstruct competing projects, Defendants' actions against competing redevelopment projects in the Greater Hoboken Area have not been intended to raise legitimate disputes or to obtain relief on any legitimate claim, but have instead sought to manufacture the appearance of concerns in order to delay project approvals and to discourage project financing.  The string of repetitive, meritless objections launched by Defendants has therefore been part of an anticompetitive strategy "for the purpose of using the governmental process (as opposed to the outcome of that process) to harm a market rival and restrain trade." *Hanover 3201 Realty LLC v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015).

4.    Defendants' actions have not been isolated, but have been part of a coordinated effort on behalf of multiple entities to raise impediments through a persistent series of sham objections at every stage of the approval process for targeted redevelopment projects, including those owned by Plaintiffs and by other owners.  The arguments cited to object to these projects, whether before municipal bodies or in applications to the court, have been consistently without merit.  Defendants' efforts to block competing redevelopment projects have been characterized by repetition, both in filing several separate actions and in attempting to re-litigate the same issues after having been denied by the court several times over.  Where Defendants' petitions have run

2

their course, during which time substantial new rental housing supply has remained off the market, Defendants' arguments to date have been completely unsuccessful.

5.      As a direct result of Defendants' unlawful challenges, intended redevelopments owned by Plaintiffs have remained unbuilt, years after Plaintiffs entered redevelopment contracts with Hoboken and obtained site plan approvals, and over a decade after the redevelopment plan governing their properties was adopted to provide necessary housing and other improvements to a previously underused area.  Defendants' abuses of process have therefore inhibited the market for multiple-dwelling rental housing, the strains upon which are a major focus of local, state, and federal public policy due to the high costs faced by the public and the resulting effects on society and the larger economy.

6.      Defendants' succession of bad faith objections in service to their own economic interests is not shielded by standard defenses based on freedom of speech, but is instead the exact type of series of unlawful petitions that are a well-recognized exception to First Amendment protections.  Defendants' series of actions were undertaken without regard to their merit and for the purpose of restraining trade in the market for mixed-use developments containing multiple-dwelling rental housing, including by harming Plaintiffs as their competitors and interfering with the contracts and economic rights of Plaintiffs.

7.      Defendants' improper, anticompetitive motivations have been evident throughout Defendants' entire opposition to any progress on housing in Hoboken's Western Edge and have only become more blatant over time.  The law requires that Defendants answer for the damage they have caused to the market and to the public, as well as to the contracts and prospective economic advantages of Plaintiffs.

## **THE PARTIES**

8.     Plaintiff JB112 is a limited liability company authorized to do business in the State of New Jersey, with offices at 1414 Grand Street, Suite 204, Hoboken, New Jersey 07030.

9.     JB112 is the designated redeveloper of real property located at 1330 Jefferson Street, otherwise known as Block 112, Lot 1.02 on the tax maps of Hoboken.

10.     Plaintiff HWE is a limited liability company authorized to do business in the State of New Jersey, with offices at 1414 Grand Street, Suite 204, Hoboken, New Jersey 07030.

11.     HWE is the designated redeveloper of 1200-1330 Madison Street, otherwise known as Block 106, Lot 1 on the tax maps of Hoboken.

12.     Defendant Miguel Hector is an individual who, on information and belief, is a resident of Hudson County, New Jersey and who, on information and belief, has a business office located at 1807 Kennedy Boulevard, Apartment 1F, North Bergen, New Jersey 07047.  On information and belief, Miguel Hector is Co-Manager of UCMH.  Miguel Hector is also a member of the Board of Trustees of the "Palisades Cliffs Protection Alliance" ("PCPA"), a corporation formed among Defendants for the purpose of obstructing redevelopment projects in the Greater Hoboken Area.

13.     Defendant Lorgia Hector is an individual who, on information and belief, is a resident of Hudson County, New Jersey and has a business office in Hudson County, New Jersey. Upon information and belief, Lorgia Hector is Co-Manager of UCMH and a member of the Board of Trustees of PCPA.

14.     Defendant Anthony Hector is an individual who, on information and belief, is a resident of Hudson County, New Jersey and has a business office in Hudson County, New Jersey. Upon information and belief, Anthony Hector is a member of the Board of Trustees of PCPA.

4

15.    UCMH was formed as a limited liability company registered to do business in New Jersey.  On information and belief, UCMH is owned in whole or in part by 7601 MH, LLC, which is owned in whole or in part by Miguel Hector.

16.    On information and belief, UCMH's status as a limited liability company has been revoked for not filing annual reports for two consecutive years, starting from March 16, 2018.

17.    UCMH's Certificate of Formation indicates that the entity's "initial registered office and agent" as of August 11, 2015 was Miguel Hector, located at 1807 Kennedy Boulevard, Apartment 1F, North Bergen New Jersey 07047.

18.    Per allegations made by Defendants and/or their affiliates in complaints seeking to obstruct redevelopment projects, UCMH is a "50% tenant in common" of numerous properties in the City of Union City, New Jersey ("Union City') specifically at 416-500 Palisade Avenue (Block 190, Lots 35, 39 and 43.01), 504-06 Palisade Avenue (Block 190, Lot 43.02), 508-600 Palisade Avenue (Block 190, Lots 47, 50, 55, 59, and 63), and West of Viaduct (Block 189.01, Lots 10-18).

19.    Observer MH is a limited liability company based in New Jersey and referenced by Defendants in complaints seeking to obstruct redevelopment projects, but which on information and belief is not registered to do business in New Jersey.  On information and belief, Observer MH is owned in whole or in part by Miguel Hector.

20.    On information and belief, Observer MH is a member of Neumann Leathers Redevelopments Group, LLC, a limited liability company registered in New Jersey that owns the Neumann Leathers site located at 300 Observer Highway in Hoboken.  Per allegations by Defendants and/or their affiliates in complaints seeking to obstruct redevelopment projects, Observer MH is "one of three tenants in common of the Neuman Leathers Building, located at 300

5

Observer Highway in Hoboken" and designated on the Tax Map of Hoboken as Block 2, Lots 12-26; Block 2.1, Lots 1-4; and Block 2.1, Lots 9-10.

21.      The Neumann Leathers site is a former factory area in Hoboken now occupied by both residential and business tenants.  It has been designated as an area in need of redevelopment by Hoboken.  The redevelopment plan governing the site provides for rehabilitation into a modernized mixed-use development that will provide hundreds of rental apartment units.

22.      7601 MH, LLC is a limited liability company based in New Jersey.  On information and belief, 7601 MH, LLC is owned in whole or in part by Miguel Hector.

23.      John Does 1-25 are individuals thus far unknown to Plaintiffs who, on information and belief, aided and abetted Defendants' sham objections, frivolous litigation, and other anti-competitive acts.  John Does 1-25 may include any individuals who, upon the formation of PCPA, Defendants referenced when stating that they anticipated others would join in the ownership of PCPA.  Plaintiffs will amend the complaint to allege the true identifies of additional aidors and abettors who participated in conspiring in the unlawful actions of Defendants when they are ascertained.

24.      ABC Companies 1-25 are companies thus far unknown to Plaintiffs who, on information and belief, aided and abetted Defendants' sham objections, frivolous litigation, and other anti-competitive acts.  ABC Companies 1-25 may include any companies who, upon the formation of PCPA, Defendants referenced when stating that they anticipated others would join in the ownership of PCPA.  Plaintiffs will amend the complaint to allege the true identifies of additional aidors and abettors who participating in conspiring in the unlawful actions of Defendants when they are ascertained.

## JURISDICTION AND VENUE

25.    The claims in this action arise under the federal antitrust laws (specifically 15 U.S.C. §§ 1 and 15) and New Jersey law.

26.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 15.  With respect to the violations of New Jersey law, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

27.    This Court has personal jurisdiction over Defendants under 28 U.S.C. § 1391 and 15 U.S.C. § 15 because Defendants are domiciled in New Jersey, are licensed to do business in New Jersey, maintain multiple properties in New Jersey, and have continuous and systematic contacts in New Jersey.  The actions of Defendants alleged by Plaintiffs all took place in the State of New Jersey.

28.    Venue in the District of New Jersey is appropriate because both Plaintiffs and Defendants are domiciled in the District of New Jersey, and the actions giving rise to the claims all took place within the District of New Jersey (specifically Hudson County, New Jersey).

## BACKGROUND AND FACTUAL ALLEGATIONS

### Rental Housing in the Greater Hoboken Area: A Market in Crisis

29.    The New Jersey Legislature has codified the need to increase rental housing supply to keep up with demand, based on the shortages of such housing in the market. *See, e.g.* N.J.S.A. § 2A:42-84.5(a) ("The Legislature deems it to be necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey.").

30.    For the past several decades, New Jersey and its residents have borne a uniquely persistent shortage of rental housing in the face of increased demand as compared to rental housing

market trends nationwide.[1]  While this deficit is apparent state-wide, unmet rental housing needs are particularly acute in New Jersey's urban centers, such as across Hudson County and particularly in the Greater Hoboken Area, defined here to encompasses Hoboken and its surrounding municipalities in Northern New Jersey that are in close proximity to the Hudson River and New York City.[2]

31.    On the basis of census data, population growth and rental housing demand in the Greater Hoboken Area has outpaced new constructions of "multiple dwelling"[3] rental apartments. For instance, Hudson County's renter households have grown by roughly 50% from 2000 to 2020.[4]

---

[1] James W. Hughes & Joseph J. Seneca, *The Evolving Rental Housing Market in New Jersey: Retrospective and Prospective*, 32 Rutgers Reg'l Rep. 1, 1-16 (2012) ( "Close to three out of ten (29.5 percent) of all the current (2009) renter-occupied supply was built between 1960 and 1979. . . . In the 1980s and 1990s, additions to the rental inventory slowed significantly. As a result, only 9.8 percent of today's renter-occupied units date from 1980 to 1989, and only 6.4 percent from 1990 to 1999."); Eric Seymour, Will Payne, Kathe Newman, Shiloh Deitz, Lauren Nolan, *Rent Control in New Jersey Report*, Ralph W. Voorhees Center for Civic Engagement, Rutgers University (2024), https://rwv.rutgers.edu/rent-control-report/ ("*Voorhees Report*") ("New Jersey's rental vacancy rate reached a 30-year low of 3% in 2020, below the value for the US overall (6%) and the neighboring states of New York and Pennsylvania.")..

[2] *See* Housing Element and Fair Share Plan 2025, City of Hoboken (May 19, 2025), 685965072d0012abde33b135_20250611_FINAL_HEFSP_signed.pdf ("Hoboken HEFSP 2025") (noting the total occupancy rate in Hoboken across owner and renter occupied housing units as 92.2% as of 2023); *Voorhees Report* at 1 ("In New Jersey's more densely populated counties, the typical rent for units with the same set of features has increased since 2019. Most counties exhibited increases of $500 or more a month for the average unit during this period, representing large percentage increases (Zillow, 2023). In higher-cost counties like Hudson, the typical rent asked was 20% higher in January 2023 compared to 2019.").

[3] A "multiple dwelling" building is typically defined a containing four or more units rented to four or more tenants or family units.

[4] Lauren Nolan, *Hudson County Rental Housing Profile*, Rutgers University Ralph W. Voorhees Center for Civic Engagement (Aug. 2024), https://rwv.rutgers.edu/hudson-county-rental-housing-profile/

Renter households make up 65.9% of Hoboken's population as of 2023.[5]  Nevertheless, over 30% of Hoboken's rental units were built prior to 1940, while only 23% were built since 2000.[6]

32.      Stalled construction across New Jersey—and particularly its urban hubs—is further reflected in recent census data, which reveals a 50% drop in multifamily housing permits issued in April 2025 as compared to April 2024 across the New York, Newark, and Jersey City area, a decline outpacing nearly all comparable multifamily markets nationwide.  The drop has been particularly significant in the Greater Hoboken Area.[7]

33.      Rental housing shortages across New Jersey have spurred sharp increases in average monthly rent prices, despite the State Legislature's attempts to find policy solutions to the housing shortage.[8]  Notably, as of 2023, Hoboken's rental housing market, as compared to other communities in Hudson County, has the single highest median gross rent at roughly $2,819 per month;[9] that figure represents a roughly 26% growth from the 2017 Five-Year American

---

[5] *See* Hoboken HEFSP 2025.

[6] *Id.*; *see also* Hoboken HEFSP 2025 (noting 36.3% of housing units in Hoboken were built prior to 1940, and 31.6% were built since 2000).

[7] *See also* Hoboken HEFSP 2025 (noting a "significant drop-off in issuances [of residential certificates of occupancy, building permits, and demolition permits issued by the City of Hoboken] starting at the onset of the COVID-19 pandemic in 2020 and continuing through 2023. This would suggest that residential construction has not rebounded in Hoboken since the economic and social upheavals of the pandemic[.]"

[8] *See* Taylor Jung & John Reitmeyer, *NJ Rents Keep Rising*, NJ Spotlight News (Dec. 12, 2024), https://www.njspotlightnews.org/2024/12/new-jersey-rents-keep-rising-pressuring-lower-and-middle-income-residents/ ("[I]n New Jersey, rents are increasing at a higher rate than other parts of the nation. The state is already known for its high cost of living, and wages have not increased at the same pace as monthly housing costs. Advocates and policy analysts say state leaders need to do more to mitigate not just homeownership costs, but rental costs, too . . . A housing shortage is one reason why rental costs have increased in recent years. . . .").

[9] Hoboken HEFSP 2025.

Community Survey ("ACS") to the 2022 Five-Year ACS.[10]  Hudson County's next two highest median gross rent centers, Weehawken Township and the Town of Secaucus, were roughly $2,300 and $2,150 respectively, according to 2022 Five-Year ACS numbers.[11]

34.    Local government officials in the Greater Hoboken Area frequently cite to the "housing shortage" and "housing crisis" as priority issues affecting the community.  Policies to address shortages of available rental units in the housing market are frequently discussed in the Greater Hoboken Area at the forefront of debates regarding potential legislation and other government action.

35.    In addition to facing the statewide housing shortage in New Jersey, the Greater Hoboken Area is also substantially affected by interstate market pressures due to its proximity to New York City's notoriously tight rental housing market.[12]

36.    Slowdowns in construction, despite the consistently increasing demand, also pose public health concerns.  Older constructions in the Greater Hoboken Area "may pose health and safety hazards such as lead paint, lead pipes, or asbestos and may be more costly and difficult to maintain" as compared to new builds.[13]

---

[10] Nolan, *Hudson County Rental Housing Profile*.

[11] *Id.*

[12] *See* Marcel Negret *et al*, *Housing Jersey City: Assessing Current and Future Gaps*, Reg'l Plan Assoc. (Dec. 2024), https://rpa.org/work/reports/jersey-city-housing-needs-assessment ("Jersey City has taken many deliberate steps to increase housing production … But the city still faces high housing costs, driven in part by the broader metropolitan housing deficit caused by years of underbuilding.  This regional deficit, together with the type of stock coming online and the city's livable and accessible conditions, has further induced demand. With low vacancy rates that have decreased in time and demand exceeding the pace of new development, housing costs in Jersey City continue to rise.").

[13] Nolan, *Hudson County Rental Housing Profile*.

37.     Beyond the costly effect of inadequate housing markets on consumers, correlations have also been established between rental housing shortages nationwide and historically high inflation in recent years.[14]  A federal government-published report, among other studies, notes that "housing costs have been a major contributor to core inflation since price pressures began to ease," and that a study of yearly core inflation "over the long term, once again show[s] housing's outsized role in inflation."[15]  As recently as September 23, 2025, the Federal Reserve Chair Jerome Powell,

---

[14] *See generally* U.S. Gov't Council of Economic Advisors, *The Role of Housing in U.S. Inflation*, Blog Post, https://bidenwhitehouse.archives.gov/cea/written-materials/2024/09/11/the-role-of-housing-in-u-s-inflation/#:~:text=In%20August%2C%20housing%20contributed%2016,low%20yearly%20rate%20of%201.8%25 (Sept. 11, 2024).

[15] *Id.*; *see also* n.11, *supra* ("[U]nlike the inflation we saw soon after the onset of the pandemic, the more recent bout was overwhelmingly driven by the rising cost of what the Consumer Price Index classifies as 'shelter' — including rent actually paid and the estimated rent that could be charged for owner-occupied homes."); Boaz Abramson, Lu Han & Pablo De Llanos, *Higher Rates, Higher Rents: How Monetary Policy Affects Housing Costs*, Columbia Business School, https://business.columbia.edu/press-release/cbs-press-releases/higher-rates-higher-rents-how-monetary-policy-affects-housing#:~:text=The%20results%20show%20that%20a,increasing%20reliance%20on%20rental%20housing (Jun. 3, 2025) (""Rent is the single largest component of the consumer price index (CPI) and a key determinant of inflation. Our research shows that by increasing rents, interest rate hikes can unintentionally drive-up inflation[.]"); Miles Guerin, *Fact Check: Are housing costs driving inflation in 2024?*, ECONOFACT, https://econofact.org/factbrief/are-housing-costs-driving-inflation-in-2024#:~:text=The%20rise%20in%20housing%20costs,countering%20misinformation%20and%20spreading%20facts (Aug. 22, 2024) ("The rise in housing costs has been a major source of overall inflation, which was 2.9% in the 12 months ending in July 2024.  The Bureau of Labor Statistics' shelter index, which includes housing costs for renters and homeowners, rose 5.1% in the 12 months ending in July 2024.  Housing costs account for 36.3% of the Consumer Price Index.  This represents the largest share of any category."); Alexander Conner, Sophia Campbell, Louise Sheiner, & David Wessel, *Commentary: How does the Consumer Price Index account for the cost of housing?*, Brookings, https://www.brookings.edu/articles/how-does-the-consumer-price-index-account-for-the-cost-of-housing/#:~:text=Housing%20represents%20about%20one%2Dthird,measured%20separately%20in%20the%20CPI (Jan. 31, 2024) ("Housing represents about one-third of the value of the market basket of goods and services that the Bureau of Labor Statistics (BLS) uses to track inflation in the Consumer Price Index (CPI). A rise in the cost of housing—what the BLS calls shelter—contributed to high inflation in 2022 and 2023.").

in addressing current interest rates, stated that "roughly 36 million Americans are experiencing poverty, and housing is too expensive and in too short a supply everywhere . . . Activity in the housing sector remains weak."[16]

38.     One factor for this rental housing shortage is the difficulty for developers who endeavor to contract for and construct multiple dwelling rental apartment buildings and must go through a rigorous approval process.  In response, encouragement for the construction of new multi-family rental housing has been legislated as a matter of public policy in New Jersey.  New Jersey's Legislature has sought to remedy hurdles facing developers and constructions that could serve New Jersey's ever-increasing number of would-be renters, based on a declared public policy in favor of increasing the supply of multiple-dwelling rental housing.  See, e.g., N.J.S.A. §§ 2A:42-84.5-84.6 (codifying Legislative intent to enact policies to increase the supply of multiple dwelling rental housing); N.J.S.A. §§ 40A:12A-11.1 (legislative declaration of mandate for redevelopment agencies to "construct new housing" pursuant to the New Jersey Local Redevelopment and Housing Law).  Federal legislation has also recently sought to tackle the national housing shortfall.

39.     Despite such legislative efforts, strategic and frivolous petitioning and litigation before zoning and planning boards, as well as in state courts, poses a considerable obstacle for

---

[16] Mike Winters, 'High Home Prices Aren't 'Something the Fed can Really Fix,' says Federal Reserve Chair Jerome Powell,' CNBC, https://www.cnbc.com/2024/09/19/jerome-powell-high-home-prices-arent-something-the-fed-can-fix.html#:~:text=Federal%20Reserve%20chair%20Jerome%20Powell%20said%20the,National%20Association%20of%20Realtors%27%20most%20recent%20projections. (Sept. 19, 2025) ("Federal Reserve chair Jerome Powell said the 'real issue' behind high prices in the U.S. housing market is a lack of supply, which isn't 'something the Fed can really fix.' There's currently a shortage of about 4 million homes in the U.S., according to the National Association of Realtors' most recent projections. As such, the imbalance between supply and demand will continue to put upward pressure on prices.").

developers seeking to enter markets for multi-dwelling rental apartment buildings, further raising costs that may be passed on to prospective tenants and taxpayers in the Greater Hoboken Area.

40.     Systemic opposition to construction of new rental housing therefore restrains the market for rental housing available to potential tenants.  Restraints on these markets harm tenants subject to higher rents, contribute to inflation, and have cascading effects throughout society that increase costs for taxpayers in the Greater Hoboken Area.

**Long-Delayed Housing Redevelopments in Hoboken's Western Edge**

41.     The Western Edge Redevelopment Area ("WERA") is located in northwest Hoboken, designated as the zone comprised of  Block 92, Lots 1.01 and 1.02 ("Block 92"), Block 106, Lot 1 ("Block 106"), and Block 112, Lot 1.01 and 1.02 ("Block 112") on the Tax Map of the City of Hoboken.

42.     The WERA has been studied as a potential "Area in Need of Redevelopment," in accordance with the criteria specified at N.J.S.A. 40A:12A-5, since at least 2006.  This area was originally so-designated in 2007, but a redevelopment plan was not adopted until August 2015.

43.     Historically, the area compromising the WERA and surrounding blocks has been principally used for industrial activity and transportation warehousing, which largely remains the case today as construction of housing within the redevelopment zone has stalled.

44.     The Western Edge Redevelopment Plan ("WERP"), originally adopted by ordinance on August 5, 2015, sets forth plans and regulations for the development of real property within the WERA.  The WERP has been amended by subsequent ordinances, most recently on September 3, 2025.

45.     The WERP was adopted pursuant to the Local Redevelopment and Housing Law and also describes its relationship with the operative New Jersey State Development and Redevelopment Plan, which seeks to "[P]rovide a full range of housing choices through

redevelopment, new construction, rehabilitation, adaptive reuse of nonresidential buildings, and the introduction of new housing into appropriate nonresidential settings."

46.    Plaintiff Just Block 112, LLC is an owner of Block 112, Lot 1.02 in the WERA and is the designated redeveloper for Block 112 pursuant to the Local Redevelopment and Housing Law.  Hoboken designated JB112 as the redeveloper of all of Block 112, Lots 1.01 and 1.02, on February 22, 2017.

47.    Plaintiff Hoboken Western Edge, LLC owns Block 106 in the WERA ("Block 106," together with Block 112, the "Properties") and is the designated redeveloper for Block 106 pursuant to Local Redevelopment and Housing Law.  Hoboken designated HWE as the redeveloper of Block 106 on December 20, 2017.

48.    In addition to Blocks 112 and 106, the WERA also contains property that is not owned by either of Plaintiffs, but which are likewise subject to specific provisions in the WERP.  Block 92, Lot 1.01 is multi-family residential building at 900 Monroe Street doing business as "The Vine."  Block 92, Lot 1.02, at 930 Monroe Street, recently secured approval for a site plan including six hundred seventy-four (674) new residential units.

49.    The WERP describes plans for redevelopment that include construction of mixed-use developments predominantly consisting of multiple-dwelling rental housing (the "Projects").

50.    While the WERP, and State Local Redevelopment and Housing Law, support the ultimate goal of redevelopment of the Properties, numerous regulatory processes must still be completed to successfully complete construction.  The WERP adopted by the Hoboken City Council ("City Council") and signed by the Mayor of Hoboken dictates specifications for redevelopment of the Properties.  After acquiring the land and being designated as redevelopers, redevelopers must work with Hoboken and its Community Development department and negotiate

redevelopment agreements specific to the redevelopment of their individual lots. Redevelopers must submit site plans to Community Development for confirmation that the site plans are consistent with the WERP and applicable redevelopment agreements. Then, redevelopers must submit site plan applications to the Hoboken Planning Board (the "Planning Board" or "Board") for approval. Any amendments to the WERP must likewise be adopted by the City Council, sent to the Planning Board for a review of consistency with Hoboken's Master Plan, and approved by the Mayor. The process is arduous and time consuming even when all approvals are granted without issue, and the separate stages provide many points where obstacles may occur.

51.     The WERP currently permits construction of over 1,600 units of rental housing between the Properties, a major boost to supply in the local rental housing market.

52.     In addition to the rights granted through the WERP and redeveloper designations, Plaintiffs also have rights secured by various contracts governing the redevelopment projects.

53.     Plaintiffs and Hoboken have entered into redevelopment agreements for the respective Properties, consistent with the WERP. These redevelopment agreements are enforceable contracts. During the time covered by most of the facts alleged in this Complaint, the operative version applicable to Block 112 was an Amended and Restated Redevelopment Agreement between JB112 and Hoboken dated August 10, 2020 and amended January 13, 2021. The Redevelopment Agreement applicable to Block 106 was entered into between HWE and Hoboken effective October 21, 2020.

54.     Approvals of site plan applications for construction on Block 112 and Block 106 were granted by resolution of the Hoboken Planning Board on May 2, 2023.

55.     On October 8, Hoboken and JB112 entered into a Second Amendment to the Amended and Restated Redevelopment Agreement for Block 112 applicable to Block 112, Lot 1.02.

56.     The project described in both the August 10, 2020 and current versions of the Block 112 redevelopment agreements comprises multi-family residential buildings, which may, between the sites, contain up six hundred fifty-five (655) total residential units.

57.     Hoboken and HWE entered into an Amended and Restated Redevelopment Agreement for Block 106 on October 8, 2025.

58.     The project described in both the October 21, 2020 and current versions of the Block 106 redevelopment agreement comprises mixed-use residential buildings.  The October 21, 2020 agreement permitted a mixed-use residential building containing up to seven hundred and one (701) residential units, and the current operative Block 106 redevelopment agreement permits over one thousand three hundred (1,300) residential units, consistent with amendments made to the WERP.

59.     JB112 and HWE are also each party to separate settlement agreements with Hoboken entered to resolve disputes related to the redevelopment projects.  These settlement agreements were fully executed as of September 19, 2024, submitted to the Superior Court of New Jersey, Law Division ("State Trial Court") on October 11, 2024, and "so-ordered" January 16, 2025 (the "Settlements").

60.     The Settlements include agreement to conditional tolling of claims asserted by Plaintiffs against Hoboken, such that Plaintiffs' claims against Hoboken shall be dismissed with prejudice provided that Hoboken successfully authorizes certain amendments in the WERP to permitted specifications for the Properties pursuant to required legal processes, including those for

adoption of redevelopment ordinances and authorization of redevelopment agreements, and that site plan approval is ultimately granted for those developments.

**Defendants' Competing Interests in Conflict with the Western Edge Redevelopment Plan**

61.     The Projects on Block 112, Block 106, and other property in the WERA approved by Hoboken and the Hoboken Planning Board compete with Defendants' properties in the markets for rental housing and for development and ownership of sites containing multiple-dwelling rental housing.  The projects planned in the redevelopment plan for the Neumann Leathers site owned by Defendants and those planned in the WERP occupy similar spaces in the market.  Upon information and belief, Defendants own properties in the Greater Hoboken Area, other than those in the Neumann Leathers site, that contain or project to contain substantial additional rental units competing in the market with rental units planned in the WERA.  Projects in the WERA also compete with viewsheds available from Defendants' properties in Union City, as available views from units constructed as part of the WERP may affect available views from Defendants' properties.

62.     The WERA borders the Palisades, a line of hills that partially runs along the border between Hoboken and Union City.  Defendants' properties in Union City are located on the higher elevation atop the Palisades, while the WERA and Hoboken are at the base of the Palisades.  Views from the Palisades in Union City over the WERA and Hoboken include views of the New York City skyline and surrounding areas.

63.     Defendants have been open about seeking to prevent new construction that could affect views from their properties in Union City.

64.     Although Defendants have cited their properties on the Palisades as among those affected by the Projects, Defendants have also cited their properties in Hoboken as having an interest in preventing construction of the Projects.

65.     Defendants formed an agreement to back efforts to oppose construction of the Projects and other redevelopment in the WERA.  As a vehicle for this agreement and opposition to the Projects, Defendants collectively formed a corporation called "Palisades Cliffs Protection Alliance, Inc." ("PCPA").  Although the corporation purports to be formed for "nonprofit, charitable, recreational, and educational purposes," in practice it is merely a front to engage in sham legal objections to protect Defendants' own narrow interests.  While the organization professes to seek to "maximize scenic resources," the only actions taken for such purpose have been to block buildings in Hoboken.  The PCPA organization does not seek to protect the physical Palisades itself or to conserve scenic resources by limiting development on the Palisades Cliffs.

66.     It is well established that New Jersey Law does not provide any right to protect scenic views.  *See, e.g., In re Riverview Dev., LLC Waterfront Dev.  Permit*, 411 N.J. Super. 409 (App. Div. 2010) (emphasis added) ("As a well-settled matter of law, 'in the absence of a restrictive covenant, a property owner has no right to an unobstructed view across a neighbor's property'") (quoting *Bubis v. Kassin*, 323 N.J. Super. 601, 616 (App. Div. 1999)).

67.     Defendants' series of petitions in opposition to the Projects and other redevelopment in the WERA, while cloaked in "legal" objections, have therefore always been transparent pretexts in place of goals not supported by law.  Defendants profess to serve public interests, but do not fully acknowledge that they seek to block projects that would compete with their own properties, including with Defendants' properties in Hoboken that have nothing to do with the Palisades Cliffs at all.

68.     While legitimate disputes are protected First Amendment activity, abuse of process to collaterally attack and injure business competitors is not protected.  There is no constitutional shield for a series of repetitive petitions that are objectively baseless, or that are undertaken for the purpose of using the governmental process to harm market rivals and restrain trade.

69.     Unlawful, anti-competitive actions beyond the protections of the First Amendment are tortious when aimed at another's rights obtained in contract or through duly-granted government approvals.

70.     Defendants' relentless filing of several successive litigation complaints, and their other objections lobbed at every consideration of the Projects by Hoboken's City Council and Hoboken's Planning Board, are precisely the type of "series of sham petitions" that are not protected by the First Amendment.

71.     In contrast to Defendants' claims (through PCPA and on their own behalf) to represent the public interest, the actual public entities involved, Hoboken and Union City, have both resolved all disputes related to Blocks 112 and 106.  Defendants have carried on because their motivation has always been to serve only their own private interests.

72.     Defendants' criticism of the Settlements is also driven only by Defendants' own interests.  In addition to encouraging superseding legislation permitting construction of additional rental housing in competition with Defendants, the Settlements and related legislation hastened dismissal of Defendants' primary litigation claims against the Block 112 and Block 106 by rendering such claims moot.  Defendants' lip service paid to the public interest of the citizens of Hoboken when criticizing the Settlements, including by criticizing the bargain struck by Hoboken to resolve litigation, therefore has no credibility.  The citizens of Hoboken have no interest in

protecting the privileges of a select group of property owners, and are in fact damaged by Defendants' ongoing restraint of an already tight rental housing market.

73.     None of Defendants' series of objections or petitions, including those involving separate litigation complaints filed with the State Trial Court, have merit. Such petitions instead raise a multitude of sham objections and/or arguments, all or substantially all of which are objectively baseless.

74.     In addition to the lack of merit in Defendants' individual counts asserted in litigation, Defendants' standing is deficient given that there is no actual legal harm giving rise to their claims. Their perceived harm is exclusively limited to alleged interference with their views, which is not an actionable right "to use, acquire or enjoy property." Defendants are therefore not truly "interested parties" with standing to challenge the legislation at issue in their succession of actions filed in the State Trial Court. The absence of any actionable right is even more glaring in the context of challenging the Settlements, where Defendants demand to substitute their own judgment over elected officials' evaluation of legal risks in the best interest of the municipality.

75.     Defendants have raised their succession of pretextual claims for the purpose of creating the appearance of a "cloud of litigation" around the projects. Defendants understand that repetitive litigation frustrates efforts to obtain project financing, because prospective financial partners view pending litigation as an undesirable risk, regardless of its merit. Defendants' goal has therefore been to maintain a series of constant impediments rather than to be successful in the outcome of any discrete claims within the dispute.

76.     Defendants' continuing stream of objections and litigation further requires both property owners and Hoboken to constantly expend resources to fend off Defendants' arguments, further hampering progress in the WERA.

77.     On information and belief, preventing the construction of major redevelopment projects in Hoboken's Western Edge has increased the relative value of property owned by Defendants as compared to the properties in the WERA.  For Defendants' properties that charge rent to tenants or project to charge rent to tenants in the future, Defendants have also, on information and belief, been able to charge or project to be able to charge higher rents as a result of preventing competing rentals in the Western Edge.

**Defendants' Agreement to Orchestrate a Relentless Campaign of Sham Objections and Frivolous Complaints**

78.     Defendants' initial petitions against redevelopments in the WERA were made by UCMH as the named party, in conjunction with Union City.  UCMH joined claims asserted by Union City at the time Plaintiffs sought to move forward with the Projects and project site plan approvals became contested.

79.     Later, as the Settlements between Plaintiffs and Hoboken were proposed—paving the way for construction to begin with more housing units added to the permitted project specifications—Defendants formed an agreement to oppose redevelopment in the WERA independent of Union City and became more directly involved in nonstop opposition efforts. Defendants hired their own separate counsel who specialize in objector actions, separate from Union City, and began to appear as separate objectors for UCMH before eventually litigating under the collective guise of "PCPA."

80.     Since reappearance with new counsel, Defendants have repeatedly challenged legislation before the Hoboken City Council and Planning Board, initiated lawsuits in New Jersey State Court, demanded needless delays, and filed repetitive and unavailing motions to harass Hoboken, Plaintiffs, and other property owners in order to slow proceedings and redevelopment approvals generally.

21

81.    Defendants' allegations and arguments in support of their objections have been characterized by baseless smears, hyperbolic innuendo, bad faith mischaracterizations, lack of candor with State Trial Court, and refusal to take no for an answer when repeatedly denied requested relief.

82.    The petitions, litigations, and other objector activity initiated by Defendants and enumerated herein have been objectively unfounded, in that no reasonable litigant could realistically expect success on the merits.  Defendants agreed to initiate these objectively meritless petitions, litigations, and other objector activity to restrict the markets for rental housing and redevelopment of sites for multiple-dwelling property in the Greater Hoboken Area through the abuse of governmental processes as an anticompetitive weapon, as opposed to hoping to obtain relief from the ultimate outcome of these processes.

**A.    UCMH joins Baseless Claims Used as Pretext to Block Projects**

83.    The Doomed "Third Party Complaint:  The first documented petition submitted by Defendants against redevelopment in the WERA was the "Third-Party Complaint" in the HUD-L-4207-21 action (the "Original Redevelopment Litigation"), which UCMH joined as third-party plaintiff, along with Union City and two other private entities, 400 Palisades Development LLC and UCLC Terra Heights, LLC.  On information and belief, certain of the owners of 400 Palisades Development LLC and UCLC Terra Heights, LLC share ownership interests with certain of Defendants on other properties.

84.    The Original Redevelopment Litigation was first filed by Plaintiffs against Union City, Hoboken, and certain Hoboken-affiliated defendants following initial denials of Plaintiffs' site plan applications for Block 112 and Block 106 by the Hoboken Planning Board.  Plaintiffs alleged that Union City's leadership had improperly pressured Hoboken's leadership to breach redevelopment agreements with Plaintiffs and oppose the site plan applications, leading to the

denials.  UCMH was originally represented in joining the Third-Party Complaint by the same counsel representing Union City, who filed the Third-Party Complaint together with Union City's answer to Plaintiffs' claims against Union City for tortious interference with Plaintiffs' redevelopment agreements and Plaintiffs' other economic advantages.

85.     The Third-Party Complaint highlighted opposition to the building heights permitted in amendments to the WERP and redevelopment agreements underlying Plaintiffs' intended Projects on their Properties.  *See, e.g.,* Third-Party Complaint at ¶¶ 2, 10, 33, 162, 185, 191 (emphasizing that alleged improprieties regarding amendments to the WERP were based on allegations related to building heights).  It did not directly allege that potentially affecting views from atop the Palisades was unlawful, however, but instead contained a laundry list of pretextual objector claims without basis in law.

86.     For example, the Third-Party Complaint alleges that agreements based on the amended WERP should be invalidated because of "promissory estoppel," based on the reliance of the Mayor of Union City on assurances related to height from the Mayor of Hoboken, a theory completely devoid of legal support.  The Third-Party Complaint further contends notice was not provided and proper meetings were not held for meetings from which the Third-Party Complaint quotes the notice statement provided by Hoboken and which objector counsel attended.  Numerous allegations indirectly reference failure to account for the impact to views from the neighboring municipality, a nonexistent obligation contradictory to the Local Redevelopment and Housing Law.  Other complaints about the community benefit payments included in redevelopment agreements for the Projects are plainly inapplicable, suggesting that any claim that has been used to object to projects elsewhere was merely cut and pasted into a "laundry list" attempt to object to the Projects on Block 112 and Block 106.

87.     The claims in the Third-Party Complaint were also filed despite being several months beyond the presumptive limitations period for claims in lieu of prerogative writs challenging municipal actions under New Jersey State Law.

88.     The Third-Party Complaint included a vague count of "Conflict of Interest" tacked on as the last alleged cause of action.  No specific conflicts were included in the pleading, only the unspecified accusation that some councilmembers had conflicts of interest connected to Plaintiffs.

89.     Defendants filed a motion to dismiss the Third-Party Complaint on March 31, 2022.  Although the State Trial Court denied the motion to dismiss without prejudice, it did not base its ruling on the merits of the Third-Party Complaint's allegations.  The State Trial Court instead cited Plaintiffs' potential lack of standing under the New Jersey court rule for motions to dismiss, because the Third-Party Complaint tactically excluded Plaintiffs as third-party defendants, even though the Third-Party Complaint specifically sought to eliminate regulatory designations underlying Plaintiffs' projects (and Plaintiffs were therefore necessary and indispensable parties).  The State Trial Court also noted that, because Union City had been included in the action as a defendant, some limited discovery on Union City's conflict of interest claim was warranted prior to disposition of "third-party" causes of action by parties that included Union City.  The State Trial Court did not address the merits or limitations period of any of the remaining claims.

90.     Failed Request to Stay Ruling on Site Plan Approvals.  Plaintiffs then proceeded to move for early disposition of their own prerogative writs claims, which sought to reverse the prior site plan application denials by the Hoboken Planning Board.  UCMH and the other third-party plaintiffs argued that the Court should not rule on Plaintiffs' applications until after their own claims against the zoning underlying the projects were decided, but the State Trial Court was

24

unpersuaded by these arguments and ruled in favor of Plaintiffs' arguments to reverse the Planning Board decisions.

91.    On April 4, 2023, an Order for Remand to the Hoboken Planning Board was entered by the State Trial Court, remanding Plaintiffs' applications for site plan approval at the Properties to the Planning Board to adopt resolutions consistent with the April 4, 2023 Order.  The Board adopted resolutions on May 2, 2023, approving Plaintiffs' applications for preliminary and final major site plan approval on the Properties.

92.    As litigation of the remaining claims in the Original Redevelopment Action proceeded following resolution of Plaintiffs' prerogative writs claims, Plaintiffs served discovery upon UCMH and the other third-party plaintiffs who had joined Union City to attack their projects. Plaintiffs' discovery requests sought to explore the make-up of UCMH and the third-party plaintiffs, as well as their motivations for suing to block the Projects on Block 112 and Block 106.

93.    Rather than answer any discovery that would reveal information regarding those behind UCMH's objections and their motivations, UCMH's counsel immediately voluntarily dismissed UCMH from the Original Redevelopment Action.  Plaintiffs objected to the dismissal, and the State Trial Court ruled UCMH, while dismissed going forward, would still be required to respond to discovery as if a party.  Despite this ruling, UCMH never responded to the document requests and interrogatories propounded by Plaintiffs until providing highly deficient responses over a year later.[17]  Following their dismissal, Defendants began to criticize the efforts of Union City behind the scenes and to assert the interests of their private group independent of Union City.

---

[17] In the meantime, while UCMH was temporarily out of the Original Redevelopment Action, Union City amended the "Third-Party to Complaint" to add limited specific allegations of "conflict of interest" against three Hoboken councilmembers based on (1) alleged social relationships with a principal of Plaintiffs and (2) one councilmember having briefly rented an apartment owned by principals of Plaintiffs shortly after Hurricane Sandy in late 2012-early 2013, pursuant to a use and

**B.    Defendants Form Agreement to Launch Separate Opposition Campaign Against WERA Redevelopments With New Counsel**

94.    Following additional periods of discovery in the Original Redevelopment Action, Plaintiffs negotiated the Settlements with Hoboken, and a resolution for authorization of the proposed Settlements (Resolution 24-743) was placed on the agenda for the August 21, 2024 Hoboken City Council meeting.

95.    While construction on the Properties had not commenced as the Original Redevelopment Action continued, the Settlements promised a breakthrough for the Projects on Block 112 and Block 106 to go forward.  Separate from their complete lack of substantive merit, all of the claims alleged for the purpose of blocking the Projects on Block 112 and Block 106 could be easily resolved under New Jersey law provided that Hoboken would again support the Projects with new legislation.  Specifically, the Settlements were negotiated without the involvement of the three Councilmember Defendants against whom the Amended Third-Party Complaint alleged conflicts of interest, meaning that new provisions for the WERA contemplated by the Settlements, and the anticipated new superseding amendments to confirm specifications in the WERP, would not be subject to those allegations, even if the allegations had been legitimate.  Similarly, other claims specific to passage of the amendments to the WERP challenged in the Amended Third-Party Complaint were also easily resolved with new legislation.  Because Defendants and other

---

occupancy agreement under which she paid the same rent as the prior tenant.  (the "Amended Third-Party Complaint").  When ruling on Union City's Motion for Leave to Amend the Third-Party Complaint on December 15, 2023, the State Trial Court expanded somewhat upon its July 8, 2022 decision denying Plaintiffs' motion to dismiss without prejudice, further ruling Union City's proposed Amended Third-Party Complaint, with the additional limited allegations against the three individual Hoboken City Council member defendants (the "Councilmember Defendants"), pleaded a prima facie case for "Conflict of Interest" not subject to the ordinary limitations period.  The State Trial Court still did not, however, address arguments regarding other counts alleged by Union City and UCMH as part of that ruling, including whether counts other than the "Conflict of Interest" count were time-barred.

objectors did not actually possess a right to unobstructed views or any other claim that could permanently block the Projects, if Hoboken's democratically elected leaders again wanted the Projects built, there would be no reason for litigation of the Amended Third-Party Complaint to continue.

96.     The Settlements set new specifications for the WERP applying to the Properties. Per the terms of the Settlements, if Hoboken adopts legislation and authorizes new redevelopment agreements consistent with the Settlements using public hearings and other processes mandated under law, then Plaintiffs' remaining claims against Hoboken in the Original Redevelopment Action will be dismissed with prejudice.

97.     The Settlements contemplate construction of even more rental housing in the WERA than allowed in previous zoning.  An additional three hundred (300) units are permitted in Block 106, meaning that the Settlements incentivize Hoboken to adopt an amended WERP and redevelopment agreements allowing for over 1,350 new rental units between the Properties, a major addition to the market for rental housing in the Greater Hoboken Area.

98.     The breakthrough in planning for the Projects on Block 112 and Block 106—including both the renewed support of Hoboken and plans to add additional rental housing units that would compete with Defendants—spurred Defendants to further organize on their own behalf, and to solidify their agreement on a plan to oppose redevelopments in the WERA independently rather than relying on efforts by Union City.  Defendants engaged new counsel in August 2025 to implement their plan of opposing any approval, legislation, or other action enabling redevelopment projects in the WERA at every opportunity.  Defendants planned to form the "Palisades Cliffs Protection Alliance," formed shortly thereafter in September 2025, as nominal "public interest" organization to drive this opposition.  Defendants agreed and planned not only to make the process

of completing redevelopment as delayed and difficult as possible, but also to ensure that the redevelopment projects in the WERA appeared clouded by the dispute to potential financial partners who might contribute to successful redevelopment.

99.    Objections Force Adjournment of Consideration of Settlements: In response to public advertisement of the proposed Settlements, counsel for both Union City and Defendants (appearing as on behalf of UCMH but now represented by current counsel at Beattie Padavano LLC) appeared at the August 21, 2024 Hoboken City Council meeting to object to authorization of the Settlements.  In bombastic comments, counsel for Union City quoted from personal text messages with City Council members received in discovery, despite a Consent Discovery Confidentiality Order ("Confidentiality Order") that prohibited their disclosure.  Despite the benign nature of the quoted text messages, counsel for Union City attempted to characterize them as scandalous secrets revealed in discovery.  Newly engaged counsel for Defendants similarly appeared and demanded that the City Council delay a vote on the resolution, asserting without explanation that UCMH's prior voluntary dismissal from the Original Redevelopment Action was "suspicious."

100.    The Settlements do not impose any obligations on UCMH or its affiliates, making it highly unusual that Defendants, including entities outside of Hoboken such as UCMH, would so vociferously oppose settlement agreements contemplating zoning in Hoboken.  But Defendants' alarmist appearance to oppose the Settlements was made for entirely transparent reasons: although UCMH and its allies had previously been able to rely on the three-way dispute with both Hoboken and Union City to drag out the litigation and delay resolution of disputes around the Projects, the Settlements and renewed political approval of Hoboken made the Projects on Block 112 and Block 106 inevitable absent additional sustained efforts to jam the system.  Remaining claims in the

Amended Third-Party Complaint would quickly become moot, finally paving the way for construction to go forward after several years of obstructions and increasing competition with Defendants' development properties and rental units.

101.    As a result of exaggerated warnings to the City Council at the August 21, 2024 meeting, the City Council tabled a vote on authorization of the Settlements to its next meeting on September 4, 2024, delaying the resolution contemplated by the Settlements as a direct result of the comments by Defendants' counsel feigning grave concerns for the citizens of Hoboken to object to the Settlements.

102.    <u>Objections and Accusations Before City Council Continue as Settlements are Authorized</u>:  At the September 4, 2024 Hoboken City Council meeting, counsel for UCMH and Union City again both appeared and made accusatory comments alleging wrongdoing behind Hoboken's agreement to the Settlements and demanding that a vote on authorizing the Settlements be further delayed.  Counsel for Union City also threatened Hoboken City Council members would be subject to additional litigation discovery.  *See* LCV20251024079 (Transcript of Sept. 4, 2024 City Council Meeting) at 12:25-13:4 ("As I said to you two weeks ago, you're all going to probably get a deposition notice and you're going to get your deposition taken.  Hoboken will continue to expend legal fees.").  Counsel for Defendants likewise alleged wrongdoing, implied corruption as motivation for the Settlements, and claimed to be concerned about whether the Settlements were a good deal for the citizens of Hoboken.

103.    Following public comments and deliberations, during which a majority of the present councilmembers recognized the need to eliminate the significant liability risk posed by Plaintiffs' claims, the Hoboken City Council adopted the resolution authorizing Hoboken's entry

into the Settlements by a 5-1-1 vote. The three Councilmember Defendants named in the Amended Third-Party Complaint (one of whom was no longer on the Council) did not participate.

104. The Settlements were fully executed as of September 19, 2024. Plaintiffs, Hoboken, and the other settling parties jointly wrote to the State Trial Court on September 17, 2024 to inform the Court of the Settlements and request leave to file a motion for summary judgment based on the Settlements' promise to render all claims in the Amended Third-Party Complaint moot. The settling parties further requested leave to move for a protective order staying discovery related to the "Conflicts of Interest" claim targeting the Projects on Block 112 and Block 106, based on such discovery also being moot if the motion for summary judgment were granted.

105. <u>UCMH Moves for Reinstatement Based on Protecting Defendants' Property Interests.</u> In the meantime, on September 11, 2024, UCMH, through its new counsel, moved for its reinstatement as a party to the action, asserting that it had not actually consented to its prior dismissal executed by counsel jointly representing UCMH and Union City. In its motion, UCMH argued that it had an interest in rejoining the case because it sought to prevent "buildings and development at heights that greatly exceed previously permitted building heights and will cause an adverse impact…particularly along the Palisades where UCMH owns property."

106. The managing member and indirect owner of UCMH, Miguel Hector, submitted a sworn certification accompanying the motion for reinstatement (the "Hector Certification"). The Hector Certification alleged that Union City's counsel was conflicted and had improperly agreed to dismiss UCMH from the Original Redevelopment Action without UCMH's consent. The Hector Certification further emphasized that UCMH/Hector sought to reenter the Original Redevelopment Action based on a primary motivation of protecting views from Hector's properties, as well as other adverse impacts to "a redevelopment project proposed by UCMH as

30

the redeveloper...." The Hector Certification also swore "[t]his reinstatement of our claims will not delay adjudication of this case…" LCV20242374228 ¶ 27.

107.    Plaintiffs and the Hoboken Defendants opposed reinstatement and warned that the request was a harbinger of UCMH's intent to cause delay.  In their oppositions, they noted that UCMH's admission of its interest in protecting its own views was an illegitimate and futile claim, which could only be advanced not on its merits, but by UCMH reentering the fray to further complicate a matter otherwise headed toward resolution.  UCMH insisted in response that it had no intention of prolonging the matter.

108.    In furtherance of the terms required to complete the processes described in the Settlements, and of the legal process required for adoption of an ordinance amending the WERP, on October 9, 2024, the City Council introduced Ordinance B-715.  Ordinance B-715 amended the height specifications that had been the basis for the challenges to the WERP amendments in the Amended Third-Party Compliant.  Ordinance B-715 also stated that it amended and superseded all prior versions of the WERP.  Defendants' counsel appeared before the City Council to oppose Ordinance B-715 and once again demanded that consideration of the ordinance be delayed based on Defendants' objections.

109.    Following the introduction of Ordinance B-715, which further cemented the results of the Settlements being to render the Amended Third-Party Complaint moot, the Settlements were jointly submitted to the State Trial Court on October 11, 2024 to be judicially confirmed pursuant to a Stipulation and Consent Order among Plaintiffs, Hoboken, and the other settling parties.

**C.    Defendants Create the "PCPA" Collective and Begin Succession of Frivolous Complaints Against the Settlements and Related Redevelopment Legislation**

110.    Creation of PCPA.  Defendants created "Palisades Cliffs Protection Alliance, Inc." on October 17, 2024.  Despite Defendants identifying PCPA as a non-profit formed for the public

interest, in practice it has merely been a vehicle through which Defendants conspired to launch repetitive sham petitions under the false pretense of legal legitimacy.

111.    The board of trustees listed in PCPA's certificate of incorporation is made up of Miguel Hector, Lorgia Hector, and Anthony Hector.  The address listed as PCPA's address in the certificate of incorporation is the address of the office of Angel Hector, a family relation of the board members.

112.    The same outside counsel who had appeared for UCMH likewise appeared on behalf of "PCPA" and continued to represent the interests of UCMH and PCPA interchangeably, depending on which was technically a party to the specific action in which counsel appeared to argue in opposition to construction of redevelopment projects in the WERA.

113.    PCPA Appears Before Planning Board to Object to Heights and Request Further Delays.  The same counsel who had previously appeared on behalf of UCMH first announced their representation of "PCPA" at the October 17, 2024 public meeting of the Hoboken Planning Board, where a determination of Ordinance B-715's consistency with the Master Plan of Hoboken was considered.  As they had at the prior City Council meetings considering legislation affecting the Projects, counsel for "PCPA" again opened his comments by requesting that consideration of the legislation be adjourned.  Counsel for PCPA further proposed that several new time-consuming and costly studies should be performed prior to consideration of Ordinance B-715.

114.    Counsel for PCPA further asked the Planning Board "if there is anything else that can be done to maximize the views from Union City and certainly from my client's properties in Union City."

115.    Upon the advice of their qualified professional, the Planning Board found that the proposed Ordinance B-715 "is generally consistent with the 2018 Re-Examination Report & 2018

Land Use Element and is designed to effectuate the purpose of the same." At the conclusion of the October 17, 2024 public hearing, the Planning Board voted to recommend to the City Council that it adopt Ordinance B-715.

116. The 3969 Complaint.    On October 21, 2024—four days after PCPA was incorporated—"PCPA" filed a complaint in lieu of prerogative writs on behalf of PCPA against Plaintiffs, Hoboken, and other parties to the Settlements to challenge the validity of the Settlements (HUD-L-003969-24, LCV20242735292 (the "3969 Complaint")).

117. The claims in the 3969 Complaint are entirely frivolous. Certain of the claims assert legal arguments which have been rejected in decisions involving Defendants' own counsel, meaning that Defendants would have known that they lack meaningful chance of success on the merits when including the claims in the 3969 Complaint. Many of the asserted causes of action are not even actionable claims under the law at all, even if taken as true, suggesting an attempt to maximize the appearance of a large number of "Counts."

118. Just as with the previous claims asserted on behalf of UCMH, the PCPA claims cannot conceal that they are pretexts aimed at protecting Defendants' own properties. The 3969 Complaint professes to raise "concern" that the Settlements "are totally disproportionate to the value obtained by Hoboken" because, among other things, the Amended Project "may increase another five (5) stories above an already 'too high' project."

119. PCPA mischaracterizes the contents of the Settlements throughout the 3969 Complaint. For example, PCPA's allegation that the Settlements are "Contract Zoning" alleges that Hoboken enacted new zoning law through the Settlements themselves, rather than going through the required municipal legal processes. The provisions of the Settlements make it clear, however, that the regular process required by law must be followed. The many City Council and

Planning Board meetings that have taken place to implement the zoning contemplated in the Settlements further demonstrate that the Settlements only provided the framework to incentivize such legislation. Similar provisions have been addressed in other court decisions and are clearly approved under the law.

120. PCPA's/Defendants' assertions that Hoboken's provision of value in the Settlements to resolve litigation is "unexplained" or suggests wrongdoing are equally meritless. The litigation risk evaluated by Hoboken was well articulated in deliberation over the Settlements, and it would be absurd for a competing party to substitute its judgment for that of Hoboken's elected legislators made in consultation with Hoboken's attorneys.

121. As another example (by way of illustration and not limitation), the Fourteenth Count (Absence of Contingency), wherein PCPA/Defendants assert that "[t]he Developer Action and Third-Party Complaint may result in the invalidation of some or all of the Hoboken Projects and/or the Developers' Amended project and may cause material changes to the Settlement Agreements," is contrary to the actual terms of the Settlements and has no basis in law. Even if "lack of contingency" were an actual cause of action to challenge the Settlements, the Settlements provide for circumstances where the Projects on Block 112 and Block 106 cannot be completed due to intervening law or an adverse legal ruling. *See* Settlements §§ 8(b)-(c).

122. As another example (by way of illustration and not limitation), the Sixteenth Count (Other Provisions Are Invalid) is an inappropriate and facially invalid cause of action, which pleads no facts whatsoever supporting the claim that "other provisions" of the Settlement Agreements—which PCPA does not identify at all—render the Settlement Agreements invalid.

123. "Part III" (Procedural Claims and Insufficient Notice – Seventeenth Count through Twentieth Count) asserts various bare public notice allegations contrary to the well-established

factual background leading up to the authorization of the Settlements, including, but not limited to, the notice and hearings open to the public and attended by counsel for Defendants. Notably, when later submitting trial briefing on these claims, PCPA abandoned all claims regarding insufficient notice by the City Council and did not argue in support of any notice defect with the City Council meetings at which the Settlements were authorized at all.

124. "Part IV" (Miscellaneous Allegations – Twenty-First Count through Twenty-Fourth Count) offers more empty counts clearly attempting to pile on to an unaimed "shotgun" pleading. The Twenty-First Count (Alleged Promises) repeats the extraordinary "promissory estoppel" claim originally included in the Third-Party Complaint in the Original Redevelopment Action, but extends it even further to allege estoppel not merely on behalf of Union City and its Mayor as the alleged recipients of promises by Hoboken's Mayor, but independently on behalf of "PCPA" as a third-party beneficiary. PCPA/Defendants therefore allege they may stop a competitor's projects based on alleged unauthorized assurances by one mayor to another, which Defendants would not even have been aware of at the time.

125. Other claims, such as the Twenty-Third Count (Cumulative Error) and Twenty-Fourth Count (Right to Amend) are again so devoid of substantive allegations as to be mere attempts to run up the number of "Counts" alleged by PCPA/Defendants and provide the illusion of a complex dispute.[18]

126. The 3969 Complaint's Twenty-Second Count (Conflict of Interest) desperately attempts to shift the goalposts from the original "Conflict of Interest" claim asserted against the three Councilmember Defendants who did not participate in the Settlements. The contention that

_____

[18] Although Defendants offered to withdraw Counts 23 and 24 in response to a frivolous litigation notice, the same counts have continued to appear in Defendants' subsequent complaints.

a conflict of interest ever existed in granting previous amendments to the WERP was already unsupported and served merely as a justification for a hopeless fishing expedition. But without any specific allegation involving any actual councilmember, "conflict of interest" becomes little more than an empty phrase for Defendants to cling to, insisting they should be able to halt the Projects on Block 112 and Block 106 based only on longshot theories and innuendo.

127. Understanding that allegations specific to Councilmember Defendants who did not even participate in the Settlements would be moot, Defendants changed their theory to assert that previous relationships between nonparticipating members and Plaintiffs nevertheless "tainted" and "infected" the entire City Council.

128. Such an expansive theory of "conflict of interest" has no basis in the law of New Jersey or any jurisdiction. On the contrary, applicable decisions emphasize that allegations of "conflict" must be specific in nature, and that overturning laws based on only vague notions of a "conflict" would make governance impossible.

129. Defendants' shifting, manufactured theory of "conflict" has been particularly damaging because of the personal nature of the accusation and its chilling effect on governance. Defendants have demanded an inquisition of the entire City Council, with the transparent goal of locating the best pretext that can be twisted to allege corruption. In arguments in favor of their new theory, Defendants have routinely used inflammatory insinuations and derogatory language to insist that the entire City Council should be suspected of systemic corruption as a result of its decision to authorize the Settlements.

130. Defendants' attempts to expand their accusations of "conflict" to the entire City Council have also belied their insincere statements that they only seek to force modifications to the specifications of the Projects rather than blocking them entirely. If the entire City Council is

"tainted" by conflict, then no approvals related the Properties would be possible, and the Properties would effectively be condemned or, at minimum, subject to the final approval of Defendants rather than to Hoboken's own democratically elected officials.

131.    These unsupported—yet all encompassing—accusations of "conflict" have been the emphasis of every public appearance and filing by Defendants related to the Projects on Block 112 and Block 106 since the execution of the Settlements, even as Defendants have been unable to identify any specific conflict by any specific councilmember.  It is therefore clear that Defendants' complaints are not aimed at any individual, but at the Properties themselves. Defendants seek not to bar participation of "conflicted" individuals, but to bar construction on the Properties, based on whatever shifting theory they can muster to keep such allegations alive.

### D.    Defendants Continue to Assert Meritless Petitions in Repetitive Fashion

132.    October 22, 2024 Letter to City Council: In advance of the scheduled second reading and consideration of Ordinance B-715 by the City Council, Defendants' counsel wrote to the City Council and Mayor of Hoboken on October 22, 2024 to object to the proposed ordinance. The letter misleadingly described PCPA as a non-profit corporation representing "taxpayers from the City of Hoboken and also Union City" without disclosing that PCPA was only driven by a collective of self-interested and previously affiliated competing property owners.  The October 22 Letter repeated similar arguments as in the 3969 Complaint and requested an adjournment of consideration of the ordinance, based on the proposed increase in permitted rental housing units and an overall increase to more residential uses for the Properties.

133.    Objections at October 23, 2024 Meeting:  On October 23, 2024, the City Council held a public hearing on Ordinance B-715.  The individual Councilmember Defendants again did not participate at the October 23 hearing or vote on the ordinance.  Once again, counsel for Defendants appeared and requested the matter be adjourned based on the addition of approved

rental housing and overall mix of residential uses for the Projects.  Counsel for Defendants further demanded that every present member of the City Council (which consisted of all members other than the Councilmember Defendants) detail if they had ever, at any time, had direct communications "of any kind" or "socialized" with the principals of Plaintiffs, with "socializing" defined as "luncheons, dinners or at or in connection with any form of social event."  The City Council did not agree to the exceptional, unfounded inquisition by Defendants and voted to adopt Ordinance B-715.

134.    Meanwhile, the State Trial Court held a conference in the Original Redevelopment Action on October 30, 2024 in response to the issues raised by the Settlements.  The State Trial Court heard argument on Plaintiffs' request for leave to file a motion for summary judgment and for a stay of discovery, as well as the issue of UCMH's reinstatement in the Original Redevelopment Action, and advised that it would rule on the outstanding issues and sequencing of motions.

135.    Defendants Oppose Court Confirmation of Settlements: On November 6, 2024, Defendants submitted a letter opposing the entry by the State Trial Court of the Consent Stipulation to confirm the Settlements.

136.    The 4474 Complaint:  On November 27, 2024, PCPA filed another complaint in lieu of prerogative writs challenging the Planning Board's recommendation to adopt Ordinance B-715, and Hoboken's adoption of same. (HUD-L-004474-24, LCV20243088938, the "4474 Complaint").

137.    The 4474 Complaint largely repeats the same allegations and counts included in the 3969 Complaint regarding the Settlements.

138. The central claim behind both the 3969 Complaint and the 4474 Complaint is directly contradicted by the new allegations in the 4474 Complaint. Both complaints allege that the Settlements were illegal "contract zoning" whereby Hoboken attempted to enact legislation through the settlement agreements. But the 4474 Complaint responds to an entirely separate ordinance to implement proposed specifications in the Settlements—which progressed through two public readings by the City Council and an additional evaluation by the Planning Board—that would not have been necessary if the legislation contemplated by the Settlements was executed by the Settlements themselves.

139. The 4474 Complaint's additional allegations regarding the process to adopt Ordinance B-715 are likewise entirely unsupported and frivolous. By way of example and not limitation, the 4474 Complaint criticizes the Planner's report to the Planning Board for not taking into account the Master Plan of Union City, a separate municipality. But no such requirement exists under the law, and the 4474 Complaint's criticism of the Planner's report does not otherwise point to any actionable defects.

140. As with the 3969 Complaint, the 4474 Complaint reflexively alleges that the meetings by which Ordinance B-715 was adopted violated the Open Public Meetings Act and other notice provisions, but no actual defect in notice is specified, and Defendants eventually abandoned all arguments regarding defective notice by the City Council when later submitting briefing on these claims.

141. Ordinance B-715 only concerned amended specifications regarding permitted heights in the WERP and did not otherwise change specifications regarding the Properties or intended Projects. The amendment therefore could not conceivably have affected any substantive right of Defendants, who nevertheless sought pretexts to block the heights and to jam any zoning

or approval related to the Projects. Defendants also understood that, because Ordinance B-715 addressed the height provisions at issue in the Original Redevelopment Action, but was passed without the involvement of the three Councilmember Defendants who were named defendants in the Original Redevelopment Action, Ordinance B-715 caused the claims in the Amended Third-Party Complaint in the Original Redevelopment Action to be moot.

142.    Request to Delay Motion Against Union City: On December 19, 2024, Defendants wrote to the State Trial Court to request an adjournment of a motion to enforce litigants' rights filed by Plaintiffs against Union City, which sought relief for Union City's violations of the Confidentiality Order. The motion was not targeted at Defendants; nevertheless, after having requested delays of every scheduled meeting or conference from the time the Settlements were considered, Defendants kept up their persistent efforts to delay all proceedings related to the Projects. Plaintiffs noted in opposing the request that UCMH/Defendants had been appearing to request adjournments to delay actions concerning the projects by the Hoboken City Council and Planning Board, including at meetings held August 21, 2024, September 4, 2024, October 9, 2024, October 17, 2024, October 23, 2024, indicating UCMH's/Defendants' motivation to delay any disposition of this matter as their first priority driving reinstatement.

143.    The State Trial Court held another conference on December 20, 2024. At the conference, the State Trial Court confirmed leave for parties to the Settlements and the Councilmember Defendants to move for summary judgment on the mootness issue and that further discovery on "conflicts of interest" would be stayed pending that motion. The State Trial Court also indicated that it would "so order" and retain jurisdiction over the Settlements, over Defendants' objections. Finally, the State Trial Court also indicated it would permit UCMH to be

reinstated in the Original Redevelopment Action as a third-party plaintiff to the Amended Third-Party Complaint.

144.    As promised at the December 20, 2024 conference, on January 16, 2025, the State Trial Court "So Ordered" the consent stipulation to judicially approved the Settlements.  LCV2025 127347.

145.    Based on the pervasive defects in the 3969 Complaint and 4474 Complaint, Plaintiffs sent a frivolous litigation notice to counsel for "PCPA" pursuant to New Jersey Rule 1:4-8 on January 24, 2025, demanding that PCPA withdraw its prerogative writs claims asserted against the Settlements.  Plaintiffs' Rule 1:4-8 notice highlighted the lack of merit to PCPA's claims and the improper motivations behind them, including motivations to cause unnecessary delay, to discourage project financing, and to needlessly increase the costs of litigation.  Plaintiffs also highlighted the anticompetitive nature of the frivolous claims, based on controlling interests in PCPA being business competitors of Redevelopers who have joined together in an agreement to ensure that their own rental units and developments are favored in the local market, to the detriment of Hoboken's citizens and housing needs throughout the area.

146.    Plaintiffs' Rule 1:4-8 notice further asserted that PCPA's claims were being used or continued in bad faith and solely for the purpose of harassment, delay, and/or malicious injury to Redevelopers in express violation of N.J.S.A. 2A:15-59.1(b).  Plaintiffs noted that PCPA's claims could not be supported by a good faith argument for an extension, modification, or reversal of existing law.

147.    Counsel for PCPA/Defendants responded on February 14, 2025 with a lengthy letter reiterating the claims asserted by PCPA and accusing Plaintiffs of sending their Rule 1:4-8 notice as an improper "Strategic Lawsuit Against Public Participation" to harass Defendants, even

though Plaintiffs' notice was heavily detailed and therefore, on its face, not merely a threat or lawsuit fitting the description of a SLAPP.

148.    PCPA/Defendants offered to withdraw Counts 16 (other provisions of settlement agreement render same invalid), 20 (other procedural defects and irregularities), and 24 (reservation of right to amend) from the 3969 Complaint in response to Plaintiffs' Rule 1:4-8 notice.  The removal of only these three insignificant causes of action would not substantively change the course of the action or disposition of the 3969 Complaint in any way, and was therefore an empty act of conciliation in response to Plaintiffs' notice.  Additionally, despite the offer to withdraw these counts, PCPA/Defendants included the latter two counts ("other procedural defects and irregularities" and "reservation of right to amend") in subsequent separate complaints filed against the Projects.

149.    Second Amended 4474 Complaint: Defendants filed a "Second Amended" 4474 Complaint on January 28, 2025, which likewise did not remove any of Defendants' alleged counts in response to Plaintiffs' Rule 1:4-8 notice.  The amendments to the 4474 Complaint consisted only of reference to the Court's entry of the consent stipulation on the Settlements and alleging such should be invalidated.

### E.    Defendants' Engage in Repeated Vexatious Litigation Conduct to Draw Out Litigation and Mislead the Court

150.    After previously stating its intent to grant the motion at the December 20, 2024 conference, the State Trial Court formally granted UCMH's motion for reinstatement in the Original Redevelopment Action on January 27, 2025.

151.    Repeated Demands for Discovery During Court-Ordered Stay: Prior to the formal reinstatement—and despite the Court having stayed discovery at the December 20, 2024 conference—Defendants made repeated requests to Plaintiffs demanding reproduction of

"conflicts of interest" discovery (i.e., Plaintiffs' personal text messages and emails unrelated to the Properties) produced to Union City during the time UCMH had been dismissed from the action. Defendants continued to demand such discovery in contravention to the stay, insisting discovery would be required to defend Plaintiffs' arguments regarding mootness, even though the essence of such arguments (as acknowledged by the State Trial Court in granting the stay) was that any such discovery had been rendered irrelevant.

152.    The parties to the Settlements and the Councilmember Defendants jointly filed a motion for summary judgment on the Amended Third-Party Complaint on January 31, 2025 (the "Motion for Summary Judgment"). The Motion for Summary Judgment was based on the fact that Ordinance B-715 superseded the 2020 Ordinances and was adopted without participation by the individual Councilmember Defendants, and, therefore, cured any alleged issues in the Amended Third-Party Complaint filed by Plaintiffs.

153.    <u>Immediate Request to Delay in Contravention of Sworn Certification</u>: Despite having based its motion for reinstatement on a sworn certification that promised "This reinstatement of our claims will not delay adjudication of this case…" and insisting "UCMH has no intention of prolonging this matter," and despite the mootness arguments having already been debated in multiple submissions over several weeks, Defendants immediately requested that the Motion for Summary Judgment be delayed. Defendants did not cite to any scheduling difficulties of counsel, but rather cited only to the recent reinstatement after having just assured that reinstatement would not delay the proceeding.

154.    <u>Additional Attacks on Court Orders Regarding Discovery</u>: Defendants also coupled their adjournment request with a motion to compel discovery and an aggressive demand to vacate the applicable Confidentiality Order protecting Plaintiffs' prior document productions. Such

demands were made even though the State Trial Court had just stayed discovery at the prior conference and were repeated after Plaintiffs reminded Defendants of the stay. Further, Defendants asserted that Plaintiffs' abiding by the stay and Confidentiality Order, the importance of which had previously been emphasized by the State Trial Court when requiring discovery of the requested material, established that Defendants must be "hiding something."

155.    In a certification accompanying their opposition to the Motion for Summary Judgment, Defendants' counsel revealed that they had contacted the State Trial Court to inquire as to status of their adjournment request and request to compel discovery and had been informed that these applications were denied.

156.    Rule 1:4-8 Letter Regarding Court-Approved Motion: On February 14, 2025, Defendants' counsel sent a Rule 1:4-8 Letter to Plaintiffs, asserting that the Motion for Summary Judgment was frivolous and subject to sanctions if not withdrawn. Defendants sent this threat of sanctions even though the Motion for Summary Judgment had already been the subject of submissions and argument at conferences before the State Trial Court, resulting in the State Trial Court granting leave to file the motion and staying discovery. The Motion for Summary Judgment was ultimately successful, further demonstrating the lack of justification for Defendants' letter.

157.    Cross-Motion to Compel Discovery: Despite the State Trial Court's repeated instructions that discovery was stayed, UCMH/Defendants filed a cross-motion to compel discovery on February 18, 2025, together with UCMH's opposition to the Motion for Summary Judgment. This cross-motion, one of many repetitive motions on the same arguments during the discovery stay, was denied on February 28, 2025 at the hearing on the motions. Although the State Trial Court reserved judgment on the Motion for Summary Judgment, it immediately denied UCMH's motion to compel, citing the stay pending summary judgment adjudication.

158.    During oral argument at the February 28, 2025 hearing, counsel for UCMH/Defendants represented to the State Trial Court that entirely new studies of the WERP would not be necessary to cure alleged "conflicts of interest" through new legislation, and that only an ordinance more explicitly directed toward adopting the entire current WERP must be passed without allegedly conflicted councilmembers to effect such cure.

159.    Court Criticizes Defendants' Improper "5-Day Order" Attempting to "Get Around" Court Orders: Defendants' next tactical gambit was to submit a "5-Day Order" to the docket, which presented an order on various issues raised by Defendants, including the denied requests for discovery, denied request to vacate the Confidentiality Order, and a request to strike portions of the Motion for Summary Judgment, the latter of which had not been entertained by the Court.  The 5-Day Order confusingly coupled these issues with a proposed order to consolidate the Original Redevelopment Action with the actions initiated by the 3969 Complaint and 4474 Complaints, as well as two similar actions filed by Union City.  Although the "5-Day Order" procedure under New Jersey Court Rules is typically used to expedite the form of a memorialized order pursuant to instructions provided orally by the court, the State Trial Court had not directed Defendants to submit such an order and did not welcome it.  Instead, when denying the proposed 5-Day Order on March 13, 2025, the State Trial Court chided Defendants for their attempt to "get around" its rulings, reminded Defendants that the court's prior orders would not be modified without a motion, and noted, "according to the late Justice Coleman 'Superior Court judges…are made of sterner stuff.'" LCV2025816443.

160.    While a decision on the Motion for Summary Judgment was pending, the State Trial Court held an initial conference on March 3, 2025 regarding the 3969 Complaint and 4474 Complaint, together with separate complaints filed by Union City.  Defendants again requested

sweeping discovery into "conflicts of interest," even though these actions, in contrast to the Original Redevelopment Action, did not allege conflicts specific to any individual councilmembers. While Defendants professed they only sought "limited" discovery, they defined such limited discovery to include discovery of personal communications and depositions of the entire City Council, along with expert reports.

161.    The State Trial Court noted the discrepancy, along with the distinction between the pleadings in the new actions, and determined that no discovery in the new actions would be permitted. This ruling was confirmed in a Case Management Order entered by the State Trial Court on March 18, 2025, which also consolidated the 3969 and 4474 Actions and two Union City-filed actions into one proceeding under New Jersey's procedure for claim in lieu of prerogative writs (challenging government actions) (the "Consolidated Actions"), set a schedule for briefing and final disposition, and transitioned judicial oversight of the consolidated docket.

162.    The State Trial Court initially denied the Motion for Summary Judgment without prejudice, based on reasons described in a Corrective Order issued March 18, 2025 ("Vacated MSJ Decision"). The Vacated MSJ Decision found that, if legislation passed without the allegedly conflicted Councilmember Defendants did not fully supersede the challenged portions of the WERP, then genuine issues of material fact remained regarding those allegations. The Vacated MSJ Decision did not determine whether the three Councilmember Defendants were actually conflicted and did not imply that any such conflict would create a discoverable issue regarding the remainder of the City Council.

163.    Certain of the factual findings upon which the foundation of the Vacated MSJ Decision was made were later found by the State Trial Court to be in error. Both before and after the Vacated MSJ Decision was vacated, Defendants have repeatedly misconstrued its findings to

assert that the State Trial Court has decisively ruled that conflicts of interest existed among the City Council, despite even the Vacated MSJ Decision only stating that if the conflicts claims were not moot, then disputed issues of fact remained on that issue which would make summary judgment premature.

164.    Improper March 25, 2025 Letter: For example, with the Case Management Order in the Consolidated Actions only a week old, on March 25, 2025, Defendants filed a letter to the State Trial Court again requesting immediate discovery despite the Court's several prior rulings denying same.  LCV2025993170 (the "March 25 Letter").

165.    Defendants' March 25 Letter attempted to take advantage of the judicial transfer to submit the letter as a surreptitious motion to amend prior orders, despite the Case Management Order requiring leave to file any new motion.

166.    Defendants' March 25 Letter falsely asserted that Defendants had been denied an opportunity to make the case for discovery in the Consolidated Actions, despite the State Trial Court having reviewed their submissions on the issue and heard argument at a conference on the issue held pursuant to New Jersey Court Rule 4:69-4.

167.    Defendants' March 25 Letter also misrepresented the Vacated MSJ Order in a manner that plainly lacked candor with the State Trial Court.  Defendants reported to the new trial court judge that the Vacated MSJ Order concerned  "material issues of fact on the conflicts" alleged by PCPA/UCMH, even though the legal issues actually examined on the Motion for Summary Judgment concerned only whether the Settlements and subsequent legislation adopted by Hoboken rendered the Amended Third-Party Complaint moot.

168.    Defendants further asserted without support that there are "other conflicts that exist but are apparently in documents" protected by the Confidentiality Order in the Original

Redevelopment Action.  Defendants knew such statement to be unlikely at best, because no such document had ever been cited by Union City, which received all documents protected by the Confidentiality Order.

169.    Defendants continued to use vague innuendo to create the appearance of wrongdoing and uncertainty, arguing that Hoboken's provision of value in consideration of Settlements was "mysterious."  Such a characterization was absurd given that the terms of the Settlements, including those necessary to resolve potential significant liability for Hoboken, were long discussed in conferences with the State Trial Court and explained on the record in connection with the City Council vote.  Defendants further smeared the opposition by Plaintiffs and other parties to Defendants' efforts to derail resolution of the dispute as a "coverup."

170.    In response to the March 25 Letter, the State Trial Court issued an additional ruling on April 15, 2025, again denying Defendants' requested relief.  LCV20251101251 ("Please be advised that the Case Management Order filed by the Hon. Joseph A. Turula, P.J.Cv. on March 18, 2025, remains in full effect.").

171.    <u>Repeated Requests in Improper May 28, 2025 Letter:</u> Undeterred, Defendants *again* returned on May 28, 2025 to ask the State Trial Court to grant discovery in the Consolidated Actions and to permit PCPA/Defendants to submit expert reports, notwithstanding the prior rulings ("May 28 Letter").  The May 28 Letter repeated the same arguments previously asserted when Defendants sought and were denied discovery in contravention to the stay in place in the Original Redevelopment Action and the Case Management Order in the Consolidated Actions. LCV20251609242.

172.    In a further stunning lack of candor with the Court, the May 28 Letter misreported, "[a]t least two of the Consolidated Case pleadings aver the existence of the conflicts *that were*

*determined to exist by Judge Turula.*" (emphasis added).  Of course, even the Vacated MSJ Order did not ever "determine to exist" any conflicts of interest.

173.    Misstatements Repeated in June 6, 2025 Letter: Defendants were unrepentant and did not attempt to correct the description when the issue was raised by Plaintiffs.  Instead, Defendants attempted the same misdirection again in a June 6, 2025 Letter, inaccurately describing the prior judge's "determination on summary judgment in the [Original Redevelopment] Action that impermissible conflicts of interest between the Developers and certain council members infected the City's adoption of the Plan." Defendants further argued that new ordinances adopted by Hoboken are "an effort to expurgate the *taint of this conflict that Judge Turula determined.*" (emphasis added).

174.    Continued Misstatements in June 10, 2025 Letter: Remarkably, amid continuing objections by Plaintiffs and the other parties refuting Defendants' misstatements with citations to the record, Defendants asserted again in yet *another* misleading discovery request on June 10, 2025 (the "June 10 Letter"), "In the decisions on the motion for summary judgment [in the Original Redevelopment Action] … Judge Turula found those conflicts [alleged between members of Hoboken's Council and the Developers] to be extant."

175.    Even before the opinion was corrected and reversed on reconsideration, there was no interpretation of the Vacated MSJ Order where the characterizations repeated by Defendants could be even half-true.  The sole issue considered on the Motion for Summary Judgment was whether the claims in the Amended Third-Party Complaint (including allegations of "conflict of interest") were entirely moot in light of superseding legislation adopted by Hoboken.  The State Trial Court did not make or imply any finding regarding the merits of the "conflicts of interest"

allegation, but merely stated that if the claims were not moot, then genuine issues of material fact remained (as discovery had not been completed) that would prevent summary judgment.

176.    If the State Trial Court had actually ruled that conflicts are "extant," it would have been a significant ruling on the merits of that action and would have also informed the ruling forbidding further discovery in the Consolidated Actions prior to the judicial transfer.  Instead, the same judge who issued the Vacated MSJ Order simultaneously ruled that the conflicts previously alleged by Defendants would not even be at issue in these Consolidated Actions due to the absence of allegations against specific City Council members.

177.    Again seeking to take advantage of the judicial transfer by misleading the court on the procedural history, Defendants made additional false statements in their June 10 Letter claiming that "Although the last of the Consolidated Actions was filed November 26, 2024, no pretrial conference pursuant to Rule 4:69-4 has been held in any of the Consolidated Action cases." Of course, not only had such pretrial conference taken place, Defendants' counsel participated and submitted the requisite pre-conference statement, making this additional misstatement particularly confounding.

178.    Despite disingenuously claiming that they did not seek to affect the scheduled end date for the Consolidated Actions, Defendants' repeated requests for additional motions, expert reports, and discovery made the intent to significantly delay and derail the Consolidated Actions clear.  Defendants admitted in their June 10 Letter that their true request was to "suspend" the Case Management Order entirely, hold a new Rule 4:69-4 conference, and start anew as if the prior months had not occurred.

179.    In response to these numerous submissions, the State Trial Court again ruled on June 11, 2025, "Request for leave to file motions for discovery are hereby DENIED pursuant to

Judge Turula's March 18, 2025 Case Management Order, Paragraph 2 ('No discovery shall be permitted in the four Consolidated Matters')."  LCV20251735140.

180.    <u>More Attempted Delay Through June 11, 2025 Letter:</u> The same day they were denied in their repeated attempts to re-litigate the Case Management Order's ruling on discovery, on June 11, 2025, Defendants submitted yet another letter attempting to undermine the Case Management Order, this time requesting that the schedule be modified to permit PCPA/Defendants to file a motion for summary judgment (the "June 11 Letter").  Outside the context of Defendants' repeated requests to derail disposition of the Consolidated Actions, this request made little sense in that a briefing schedule had already been set for disposition of all claims on the existing record through the prerogative writs procedure, making a motion for summary judgment functionally redundant provided that the case management plan would not be altered.  PCPA/Defendants never elaborated on the basis upon which they believed they could move for summary judgment separate from the existing schedule.

### F.    Defendants Continue to File Repeated Sham Petitions Against New Redevelopment Legislation

181.    Defendants continued to file new separate litigations against additional legislation adopted by Hoboken to amend and supersede the WERP, even as it became clear that Hoboken's officials—otherwise famously at odds and running against each other in upcoming elections—were solidified in moving forward in support of pending redevelopment projects in the WERA.

182.    On April 2, 2025, in the wake of the Vacated MSJ Order's findings that a limited amendment was insufficient to supersede and cure the entire WERP, Hoboken scheduled a new ordinance on the City Council agenda to expressly re-adopt and re-endorse the WERP in its entirety.  After an error uploading the proposed ordinance to the public agenda, the ordinance was

reset for an April 14, 2025 first reading to ensure that the full contents of the WERP would be unambiguously at issue and considered for re-endorsement and adoption.

183.    <u>New Objections to Planning Board Approval and Adoption of B-754 by Council:</u> On April 21, the Planning Board considered Ordinance B-754 and determined that it was consistent with the Hoboken Master Plan, despite appearances and new objections from counsel for Defendants.

184.    On April 24, 2025, Defendants again sent an objection "letter brief," addressed to the Mayor and City Council of Hoboken, opposing the adoption of Ordinance B-754.  As with all in the series of petitions submitted by Defendants since the Settlements, the objection letter demanded an adjournment to slow the process.  Defendants further demanded an inquisition into the entire City Council based on a contention that the lack of participation by the Councilmember Defendants raised suspicion, even though their absence was not based on any actual "recusal" for conflicts, but to prevent unnecessary litigation that would be rendered moot by their absence. Moreover, despite having represented to the State Trial Court at oral argument that they did not seek additional costly and time-consuming studies for the WERP to be cured of alleged defects, Defendants reversed their position and insisted that multiple new updated studies should be required for a re-endorsement of the WERP by the Council to occur.  Defendants further repeated their pattern of misrepresenting the Vacated MSJ Order, misreporting that the Motion for Summary Judgment had been initially denied "due to concerns of the Court on the conflicts."

185.    Notwithstanding Defendants' relentless bad faith objections, Hoboken adopted Ordinance B-754 on April 24, 2025.  Ordinance B-754 expressly endorsed all prior contents and amendments of the WERP to date, including by attaching the entire WERP, which was adopted anew.

186.   2155 Complaint: On June 5, 2025, Defendants filed another complaint in lieu of prerogative writs, which challenged the Planning Board's recommendation to adopt Ordinance B-754 and Hoboken's adoption of same.   HUD-L-2155-25 (the "2155 Complaint").   The 2155 Complaint is largely identical to the prior 4474 Complaint regarding Ordinance B-715 and fails to correct any of the defects in the 3969 Complaint or 4474 Complaint.

187.   New Sham Petitions and Appearance Objecting to Ordinance B-783/B-808: On June 4, 2025, Hoboken introduced Ordinance B-783, which contained further amendments to the WERP related to the Projects on Block 112 and Block 106.  The Planning Board held a public hearing for review of B-783 on June 10, 2025 and found it to be consistent with the Hoboken Master Plan, with recommendations.

188.   On July 9, 2025, Defendants' counsel submitted another letter to the Hoboken Mayor and City Council.   After requesting an adjournment in every letter and appearance submitted previously related to the Projects on Block 112 and Block 106, the July 9 letter instead complained about the clarity of the city clerk's description of the proposed ordinance being adjourned to a later meeting, an insignificant development Defendants nevertheless characterized as a "game of three card monte [that] is blatantly unfair and vexatious."

189.   After Ordinance B-783 was rescheduled for the September 3, 2025 City Council meeting as Ordinance B-808, Defendants' counsel submitted another letter in advance of the meeting repeating similar self-serving demands and objections as in previous letters.   The September 3 Letter again mischaracterized the Vacated MSJ Order, even though by that point the State Trial Court had reversed the decision and granted summary judgment dismissing all of the Defendants' claims in the Original Redevelopment Action.

190.    3961 Complaint: On October 17, 2025, Defendants filed another complaint in lieu of prerogative writs, amended December 2, 2025, which challenged the Planning Board's recommendation to adopt Ordinance B-808 and Hoboken's adoption of same.  HUD-L-3961-25 (the "3961 Complaint").  The 3961 Complaint repeats similar allegations to Defendants' previous complaints filed against the Projects and fails to correct any of the defects in the previous complaints.  The 3961 Complaint focuses in particular on opposition to the addition of new multiple-dwelling rental housing units within the mixed-use project.  On information and belief, Defendants have not yet attempted to serve any party to the 3961 Complaint.

191.    New Sham Petition and Appearance Objecting to Amended Redevelopment Agreements: The City Council scheduled review of resolutions to authorize Hoboken's entry into new amended redevelopment agreements for Blocks 112 and 106 on September 17, 2025.  In advance of the meeting, Defendants' counsel sent yet another letter to the Mayor and City Council of Hoboken opposing adoption of the resolutions.  The September 17 Letter repeated similar objections as in past petitions, adding professed concerns about the effects that new rental housing would have on parking around the WERA.

192.    The City Council was not swayed by Defendants' repeated objections and accusations, and voted to authorize the amended redevelopment agreements at the September 17, 2025 meeting.  As with all legislation related to the Projects on Block 112 and Block 106 following the Settlements, the Councilmember Defendants (who at that point had been dismissed from the Original Redevelopment Action) did not participate.

193.    4219 Complaint: On November 3, 2025, Defendants filed another complaint in lieu of prerogative writs, Resolutions 25-711 and 25-712, the Resolutions from the September 17, 2025 City Council meeting authorizing amended redevelopment agreements for Block 112 and Block

106.  HUD-L-4219-25 (the "4219 Complaint").  The 4219 Complaint repeats similar allegations to Defendants' previous complaints filed against the Projects and fails to correct any of the defects in the previous complaints.  On information and belief, Defendants have not yet attempted to serve any party to the 4219 Complaint.

194.  Objections to 914-930 Monroe Street Redevelopment: Defendants have also launched a similar string of sham objections to block redevelopment of property in the WERA not owned by Plaintiffs.  Counsel for Defendants first appeared on behalf of "PCPA" as objectors at meetings of the Hoboken Planning Board on site plan approval for the project at 914-930 Monroe Street (Block 92, Lot 1.02) on November 12, 2024, and continued to appear to object at meetings December 10, 2024, January 14, 2025, March 4, 2025, May 6, 2025, July 1, 2025, and October 20, 2025.

195.  4751 Complaint Against 914-930 Monroe Property:  After the Planning Board granted site plan approval for the redevelopment of the 914-930 Monroe Property (Block 92, Lot 1.01), on December 12, 2025, PCPA initiated HUD-L-4751-25 to challenge the approval (the "4751 Complaint").

196.  The project approval challenged in the 4751 Complaint describes a mixed-use project including approval for construction of 674 new residential units, 67 of which will be set aside for affordable housing.

197.  The 4751 Complaint describes the PCPA collective as a large group of multiple members from the Greater Hoboken Area.  ("Plaintiff PCPA is comprised of numerous taxpayers in Hoboken, New Jersey.  It also has members who have interests in real estate in Union City, New Jersey.  (There are anticipated to be added members to PCPA who are or may be taxpayers of Hoboken and/or Union City)."

198.    Like the Projects on Block 112 and Block 106, the planned redevelopments challenged in the 4751 Complaint involve specifications legislated by Hoboken in the WERP and subject to redevelopment agreements between the property redevelopers and Hoboken.

199.    As with the claims in litigation against the Properties, the 4751 Complaint attempts to amass a pile of meritless separate counts to prevent construction at the challenged site, none of which warrant reversal of the site plan approvals under the law.

### G.    Defendants Continue Misleading Petitions Even After Motion for Summary Judgment Is Granted and Amended Third-Party Complaint Dismissed

200.    These persistent relentless attempts to derail any action by Hoboken related to the Projects continued even as all of Defendants' claim against the Projects in the Original Redevelopment Action (joined with Union City) were dismissed on summary judgment.

201.    On March 31, 2025, Plaintiffs, Hoboken, and the other parties who had filed the Motion for Summary Judgment filed a motion for reconsideration of the Vacated MSJ Order based on (1) the Order basing its decision on the incorrect factual finding that the Amended Third-Party Complaint challenged the original WERP dating back to 2015, when it in fact only challenged amendments to permitted building heights that were completely superseded by Ordinance B-715 and (2) even if Ordinance B-715 was inadequate to re-adopt and supersede the relevant portions of the WERP, Ordinance B-754 expressly re-adopted the entire WERP, which Defendants and Union City had acknowledged could cure any prior alleged defects when arguing that Ordinance B-715 was inadequate.

202.    Repetitive Cross-Motion for Discovery Again Denied: In responding to Plaintiffs' and Hoboken's motion for reconsideration, UCMH/Defendants again filed a cross-motion to compel discovery, even though a subsequent ruling by the State Trial Court on permitted discovery following the Vacated MSJ Order remained pending, and Plaintiffs were not out of compliance

with any discovery obligation.  The State Trial Court denied the cross-motion on May 13, 2025, again quickly ruling that a motion to compel was inappropriate, and that the stay of discovery remained in place while the questions raised in the Motion for Summary Judgment were further reviewed in the motion for reconsideration.  LCV 20251404223.  ("Pursuant to the Court's *prior directives and Orders*, discovery would proceed, if at all, after the motion for summary judgment was complete.  This motion was filed during the pendency of the court deciding the motion for summary judgment and was thus premature.") (emphasis added).

203.    On July 10, 2025, the Court granted the joint motion for reconsideration, and in doing so vacated the Vacated MSJ Order, granted the Motion for Summary Judgment, and ordered that the Amended Third-Party Complaint was dismissed with prejudice. LCV20251979256 (the "July 10 Order").

204.    The Statement of Reasons accompanying the July 10 Order agreed with both primary arguments asserted in the motion for reconsideration, finding: (1) "The Court [] agrees with the Moving Papers that the "foundational" components of the Court's March 18, 2025 decision were misplaced as the original ordinance has not been challenged.  Rather, the challenges focus on amendments to the original plan that change the height restriction of the project.  The opposition papers do not meaningfully respond to these arguments" and (2) "The issue mentioned in the Courts March 18, 2025 Amended Order was that the Council did not readopt the entire Ordinance, but rather seemed to be a vote of a single amendment amongst a 75-page redevelopment plan. Following that Order, Movants went back to the Council where the City affirmed and re-endorsed the entire Redevelopment Plan dating back to the original adoption date. The City expressly confirms that the plan is consistent with the goals and objectives of Hoboken to encourage redevelopment."

205.    <u>UCMH/Defendants Unsuccessfully Repeat Same Arguments in Moving for Reconsideration:</u> In response, UCMH/Defendants filed their own motion for reconsideration, once again arguing that additional discovery should have been required, based upon unfounded assertions that discovery of the entire City Council remained relevant.  UCMH/Defendants also continued to argue that they had been prejudiced by not having access to discovery protected by the Confidentiality Order, which they again demanded be vacated.

206.    Defendants Attempt Another Improper "5-Day Order": UCMH/Defendants filed another improper "5-Day Order" subsequent to their motion for reconsideration of the July 10 Order, and again were unrepentant after Plaintiffs noted the impropriety of using a 5-day order for relief sought by motion rather than as intended by Rule 4:42-1(c).  The State Trial Court again rejected the 5-Day Order as procedurally inappropriate.

207.    Defendants Improperly Submit New Certifications on Reply to Motion for Reconsideration: UCMH/Defendants continued their abusive tactics by submitting two new certifications with their reply in support of their motion for reconsideration on August 18, 2025. Plaintiffs were, yet again, forced to address the impropriety of Defendants introducing new factual contentions based on such new certifications not only on reply, but in reply to a motion for reconsideration.

208.    The State Trial Court again addressed and rejected Defendants' well-worn arguments for discovery when denying Defendants' motion for reconsideration on August 29, 2025, ruling: "The outstanding discovery remaining at this stage is unspecified and hopeful at best…As discussed earlier, the conflict issue has been mooted and therefore any discovery related to such would be futile and unnecessary at this stage in the proceedings."  LCV20252413649 at 6.

209.    <u>Defendants' Trial Briefing Arguments Contradict Prior Sham Petitions:</u> As the Consolidated Actions continued following the July 10 Order in the Original Redevelopment Action, briefing was completed by the parties as of September 8, 2025.  The PCPA/Defendants brief (filed jointly with Union City) again asserted that PCPA should be provided discovery, notwithstanding the State Trial Court's many prior rulings that such discovery would be irrelevant.

210.    Many of the boilerplate objector claims included in the 3969 and 4474 Complaints were abandoned in PCPA's briefing in the Consolidated Actions, indicating that such claims were never serious or supported to begin with.  Although Defendants/PCPA included several counts in their complaints regarding insufficient public notice, including violations of the Open Public Meetings Act in authorization of the Settlements and adoption of Ordinance B-715 by the City Council, their arguments regarding notice in their brief in the Consolidated Actions were limited only to vague assertions about the meetings of the Planning Board held September 19, 2024 and October 17, 2024, not meetings held by the City Council.

211.    Defendants' shifting argument on the "conflict of interest" issue continued to contradict Defendants' contention that they merely sought modifications to the Projects, not to prevent any competing building in the WERA.  Defendants contended that the entire City Council had been "tainted," effectively seeking to prevent Hoboken from moving forward with any activity authorized by its elected government in the WERA.

212.    Defendants have also argued that the entire Council should be subject to its revised "conflict of interest" claim merely for having *received* a wedding invitation to a principal of Plaintiffs' 2016 wedding sent broadly to the Council and many others involved in civic issues throughout the area.  Such an expanded interpretation would likewise grant Defendants veto power over their competitors' property in the WERA.

213.    Defendants' Unrepentantly Attempt Yet Another Improper "5-Day Order" to
Obtain an Expedited Appeal: Remarkably, even after having prior improper uses of "5-Day
Orders" denied on multiple occasions, Defendants/UCMH again submitted a "5-Day Order"
without any prompt from the Court or consent of other parties on September 22, 2025.  The
September 22 "5-Day Order" proposed that the State Trial Court designate its July 10 and August
29 Orders as "Final" orders as to UCMH, in effect certifying them for an as-of-right appeal (and
continued multiplication of frivolous, time-consuming petitions) to which UCMH was not entitled.
Defendants falsely asserted that the proposed "5-Day Order" was submitted to "finalize the import
of [the Court's] August 29, 2025 Order," even though the State Trial Court had never implied that
it intended for such an outcome in a manner that would merit memorialization through a 5-Day
Order.  The State Trial Court accordingly rejected the latest attempted 5-Day Order on October 6,
2025.

214.    Repeated Arguments for Delay and Discovery: On September 19, 2025,
Defendants/PCPA submitted yet another request in the Consolidated Actions for leave to move for
the discovery it had consistently been denied by the State Trial Court.  Although PCPA/Defendants
stated that "[i]n briefing the matters for trial, it became obvious once again that discovery is
required and essential" and noted "the briefing you now have was not on the record when the CMO
was entered," PCPA/Defendants did not cite to any new development or argument that had not
been raised before in the multitude of submissions across both the Consolidated Actions and the
Original Redevelopment Action.  Although Plaintiffs and the other defendants to the Consolidated
Actions objected to PCPA's renewed request for discovery and sought to enforce the existing Case
Management Order, the Court issued a Clerk's Notice on September 26, 2025 that granted PCPA
leave to file another motion.

215.    <u>Defendants Continue Misleading Arguments in New Request for Discovery:</u> In the
new motion for discovery filed by PCPA/Defendants on October 8, 2025, PCPA/Defendants
repeated the same arguments for discovery on which they have been denied on a multitude of
occasions.  Astoundingly, PCPA/Defendants continued to cite repeatedly to the Vacated MSJ
Order as a basis for allowing discovery on alleged conflicts, even though the State Trial Court had
subsequently vacated that order and dismissed Defendants' claims at issue.

216.    On October 30, 2025, Union City entered a settlement agreement with Plaintiffs, in
which Union City agreed, for no additional consideration beyond a mutual release, both to dismiss
all of its pending actions against the Projects on Block 112 and Block 106 and to refrain from any
other actions to impede the Projects on Block 112 and Block 106 going forward.  There is therefore
no longer any real claim to a "public" interest asserted against the Projects on Block 112 and Block
106, but Defendants have carried forward in service to their own unique private, anti-competitive
interests.

217.    On December 4, 2025, Defendants/UCMH filed a notice of appeal to the Appellate
Division of the New Jersey Superior Court, unilaterally asserting that the stipulation of dismissal
of remaining claims against Union City following Plaintiffs' settlement with Union City permitted
them to appeal the July 10 Order and August 29, 2025 denial of reconsideration as a final judgment.

218.    On December 9, 2025, the State Trial Court denied Defendants'/PCPA's latest
motion for discovery, finding that PCPA "fail[ed] to demonstrate both the need for discovery and
why this Court should deviate from the Case Management Order entered by the Presiding Judge
on March 18, 2025.  Plaintiff's arguments in favor of granting limited discovery have been
addressed and previously denied in prior proceedings in this matter's companion cases before the
Court."

219.    Despite being once again denied in their repetitive discovery request, Defendants' motion nevertheless succeeded in supporting Defendants' ongoing effort to delay adjudication and maintain a cloud of litigation over the Projects.  The final hearing, scheduled to take place in September 2025 according to the operative Case Management Order in the Consolidated Actions, has instead been postponed until January 2026 as a result of Defendants' duplicative motion.

220.    Defendants continue to use endless challenges to maintain and draw out the dispute, despite having no reasonable basis to continue efforts to block the Projects and despite having no legal precedent for their allegations or objections.

**The Damaging Consequences of Defendants' Actions**

221.    The long series of sham objections, litigation, and other petitioning by Defendants has been intended to hinder redevelopment of the redevelopment projects in the WERA through abuse of process.

222.    Defendants have engaged in their strategy of repetitive litigation and objections based on their knowledge that such disputes, no matter how lacking in merit, create the appearance of substantial additional risk to potential lenders and other financial partners needed to invest in complex projects of the size planned for the sites in the WERA.

223.    Defendants have also engaged in their strategy of repetitive litigation and objections knowing that, even if objections are ultimately rejected and claims defeated, the lengthy time required to resolve such claims creates substantial delays, potentially placing competing projects on hold for years.

224.    Defendants' strategy is further driven by knowledge that relentless time and costs to combat an organized series of sham activity in opposition causes frustration of purpose that may ultimately succeed in blocking competing redevelopment.  While a dispute is pending, Plaintiffs and other property owners are required not only to pay costs of litigation, but also costs to carry

their properties through taxes and maintenance. Plaintiffs and other redevelopers also suffer from material changes in interest rates or construction costs that may devalue their holdings and make long-term planning riskier and more difficult.

225.    In other words, Defendants benefit from abuses of the legal system and opportunity for public comments on government action even if no court or body ever agrees with their arguments. They can, and intend to, cause damage merely through maintaining the presence of disputes at high volume, regardless of outcome.

226.    Defendants' unlawful abuses of process are particularly distasteful given that they have accused individuals of corrupt and unethical activity and used innuendo and inflammatory assertions of wrongdoing, even though such claims are completely unfounded and manufactured only to serve Defendants' need for a pretextual basis to assert objections.

227.    Defendants' ruthless effort to keep the redevelopment projects in the WERA mired in disputes has involved repeated lack of candor with the court, improper procedural tactics, and unyielding refusal to accept court rulings or legislation without presenting the same arguments again and again.

228.    The appearance of uncertainty driven by Defendants' prolonged and incessant disputes has caused real damage to the value of the Projects and prevented construction for years on end in an area long ago designated as being in need of redevelopment to benefit the public. By obstructing competing projects in the WERA, Defendants have stalled delivery of supply to the market and public benefits to those who need them most.

229.    Defendants' efforts to hold up the redevelopment projects in the WERA have prevented mixed-use developments containing hundreds of rental housing units from coming to the market, in the middle of an area for which the absence of such housing supply has been

frequently described as a crisis, and where the escalating costs of housing have substantially impacted the economy as a whole. Such artificial depression of competing supply in the market benefits Defendants at great cost to the public.

230. Defendants' constant campaign of sham disputes has also jeopardized project financing, escalated costs, and damaged the value of the properties in the WERA relative to the market.

231. Defendants' aggressive accusations and demands aimed at the elected officials of Hoboken also have a chilling effect on governance, as those seeking office are faced with the prospect of being accused of corruption or subjected to a pretextual inquisition, merely in service to a dispute over private economic interests by anyone who may not benefit from lawmaking on behalf of constituents rather than such narrow interests.

232. Defendants must be held accountable for the widespread damage caused by their abuse of the system for anticompetitive purposes. If the type of activity described herein is permitted without consequence, the legal system and provisions for public input and appeals to legislation will be increasingly used as a clog—and be clogged themselves—in a manner adverse to the public.

## FIRST COUNT

### Violation of 15 U.S.C. § 1; Conspiracy to Restrain Trade

233. Plaintiffs incorporate by reference all of the allegations previously set forth in this Complaint as if set forth at length herein.

234. Defendants are competitors in the rental housing and mixed-use real estate development markets in the Greater Hoboken Area, which involve investment in the development

of commercial real estate into properties that ultimately include rental housing, with additional retail space and occasionally other uses.

235.    The rental housing units proposed as part of the mixed-use redevelopment projects in the WERA are interchangeable with other rental housing units that are part of multiple-dwelling buildings in the Greater Hoboken Area.  A shortage of construction of new multiple-dwelling rental housing to keep up with population in the Greater Hoboken Area has caused scarcity of this type of rental housing unit in the market.  The removal of the units planned as part of approved redevelopment projects in the WERA affects the price for other rental housing in the Great Hoboken Area's rental housing market.

236.    The real property designated for mixed-use project redevelopment in the WERA is also part of a limited market for such development sites in the Greater Hoboken Area, where developers seek, in partnership with local governments, to redevelop underused lots to add mixed-use sites that will improve neighborhoods, and in particular that will add the multiple-dwelling rental housing supply identified as an urgent public need.  Developers of such property, such as Defendants, compete in the market to obtain ownership of such property, rights and approvals for development of the property, and project financing from institutions seeking to invest a limited supply of capital into development projects.  Impediments to development of such property therefore increase the relative value of similar sites in the Greater Hoboken Area that are not impeded, including by making unimpeded competing sites appear relatively less risky and more attractive to investment partners.

237.    Defendants formed an agreement to prevent development of properties in the WERA through a campaign of opposition in the courts and objections before public bodies. Including by forming the sham "public interest" corporation PCPA and agreeing to engage counsel

in a long series of constant sham objections, Defendants worked in concert to hinder, impede, delay, obstruct and/or prevent redevelopment of mixed-use projects pursuant to the WERP, agreements with Hoboken, and site plan approvals by the Planning Board that would compete with Defendants' prospective projects. This unlawful agreement and/or arrangement has the effect of limiting competition in the markets for rental housing and mixed-use development property sites containing multiple-dwelling rental housing in the Greater Hoboken Area, where Defendants own multiple-dwelling rental housing buildings and potential mixed-use development sites.

238.    The markets for development of mixed-use projects including rental of multiple-dwelling rental housing in the Greater Hoboken Area are part of interstate commerce, in that sizeable projects such as the Projects attract significant investment from across jurisdictions to finance construction and operations. The mixed-use project and multiple-dwelling rental housing markets in the Greater Hoboken Area also involve interstate commerce in that the border area between states and municipalities involves numerous commuters using rental property to live and work in New Jersey and New York, or vice versa.

239.    Defendants' series of petitions opposing redevelopment projects in the WERA were filed without regard to merit and for the purpose of using the government process to harm market rivals and restrain trade.

240.    As a consequence of Defendants' agreement to obstruct projects in the WERA, such agreement has enabled Defendants to restrain trade by increasing the relative valuation of Defendants' properties in the Greater Hoboken Area to potential investors and purchasers.

241.    The unlawful agreement by and among Defendants has also enabled Defendants to restrain trade by charging higher rents at properties that have completed development, and to prospectively charge higher rents at properties completing development in the future, in the

Greater Hoboken Area, a market where rental housing is already in critically short supply. Defendants' agreement and obstruction efforts have also insulated Defendants from competing by preventing Plaintiffs from attracting investment on their projects to offer new, diverse, and higher quality rental and purchasable property within the mixed-use sites, to the detriment of consumers throughout the Greater Hoboken Area.

242.    Defendants' conduct, as alleged above and summarized in this Complaint, violates Section 1 of the Sherman Act, 15 U.S.C. § 1. Through an agreement and/or arrangement to hinder, impede, delay, obstruct and/or prevent property redevelopers from executing planned redevelopments under the WERP, applicable agreements, and site plan approvals by the Planning Board, Defendants conspired to restrain interstate trade and commerce.

243.    Defendants coordinated their efforts in connection with their objections before the City Council, the Planning Board, and in New Jersey State Court.  Specifically, Defendants incorporated PCPA for the sole purpose of filing frivolous and repetitive litigation against redevelopment in the WERA and submitting formal objections to legislation.   Defendants have jointly employed the same legal counsel, who, on information and belief, report to the same principals of Defendants regarding all appearances to object and all litigation activity on behalf of either "PCPA" or individual entities who own or support PCPA.

244.    Defendants coordinated their efforts in the preparation and prosecution of their objectively baseless complaints and petitions described above, including, but not limited to, incorporating PCPA for the sole purpose of filing sham litigation, working cooperatively to approve complaints, briefs, motions and other documents submitted to the courts and to Hoboken in an effort to hinder, impede, delay, obstruct and/or prevent redevelopment in the WERA.

245.    By improperly and illegally hindering, impeding, delaying, obstructing, and/or preventing execution of planned redevelopment projects under the WERP though the institution and maintenance of unreasonable legal proceedings, Defendants restrained trade by preventing competition in the markets for mixed-use development properties and rental housing in the Greater Hoboken Area, and by maintaining or increasing their relative market power on the development and ownership of mixed-use projects containing multiple-dwelling rental property in the Greater Hoboken Area. This has resulted in anticompetitive effects throughout the relevant market, including higher prices, constrained services, and less choices for consumers.

246.    Lessees in the Greater Hoboken Area have been injured and will continue to be injured by the absence of competition in the housing market through higher prices and more limited/lower-quality services than would otherwise have been available had Defendants not conspired to illegally and unlawfully hinder, impede, delay, obstruct and/or prevent execution of redevelopment projects in the WERA as planned.

247.    Investors in the market for development of real estate have also been injured by reduced competition for capital to invest in such projects, and reduced options for investment balancing risk and return based on the relative advantages of potential development properties within the Greater Hoboken Area.

248.    As a result of the unlawful acts perpetuated by Defendants, Plaintiffs have suffered and will continue to suffer antitrust injury in an amount to be proven at trial.  These damages shall include the consequences of Defendants' efforts to hinder, impede, delay, obstruct, and/or prevent Plaintiffs from promptly executing their planned development Projects and thereby hindering, impeding, delaying, obstructing, and/or preventing Plaintiffs realizing the financial benefits of renting and/or selling units while forcing Plaintiffs to, at the same time, continue to pay costs to

maintain their Properties without revenue and expending substantial amounts to defend legislation and approvals from the series of sham petitions and appeals. Plaintiffs have had significantly reduced access to capital in the market for investment partners and project financing of construction as part of development of the projects, seen the value of their real estate reduced, and been unable to progress in construction and planning of their redevelopment Projects as a result.

249.    Because Defendants are willing to continuously file new meritless litigation (including the repeated demands to re-litigate requests for which Defendants have been repeatedly denied), the continued existence of these actions has materially affected transactions to finance the Projects, denying the benefits of the Projects (including affordable housing, a veterans center, and major improvements to an area in need of redevelopments) to the market and the public at large.

250.    Defendants have hindered, impeded and otherwise engaged in conduct that is anticompetitive and has otherwise interfered with and impeded competition.

251.    Plaintiffs' claim based upon this count is permitted by the private right of action granted by § 15 U.S.C. 15 to address Defendants' anticompetitive conduct and Plaintiffs' antitrust injuries.

252.    Plaintiffs' claims merit trebled damages pursuant to 15 U.S.C. § 15(a).

253.    Plaintiffs also seek to recover its costs of suit and reasonable attorney's fees, as contemplated by 15 U.S.C. § 15(a).

254.    The foregoing conduct engaged in by Defendants was so willful, wanton, malicious, and outrageous, and carried out with such a reckless disregard for Plaintiffs' rights, that Plaintiffs are entitled to an award of punitive damages.

## SECOND COUNT

### Violation of *N.J.S.A.* 56:9-3; Conspiracy to Restrain Trade

255.    Plaintiffs incorporate by reference all of the allegations previously set forth in this Complaint as if set forth at length herein.

256.    In addition to the violations of the Sherman Act, as alleged above, the unlawful acts and conduct of Defendants also violate the New Jersey Antitrust Act prohibition on conspiracies in restraint of trade within the State of New Jersey.

257.    Defendants formed an agreement to prevent development of the properties in the WERA, including by forming the sham "public interest" corporation PCPA and agreeing to engage counsel in a long series of constant sham objections against redevelopment projects in the WERA through a campaign of opposition in the courts and objections before public bodies in contravention of New Jersey State Law.

258.    As a result of the series of sham petitions and unlawful acts perpetuated by Defendants, Defendants have hindered, impeded and otherwise engaged in conduct that is anticompetitive and has otherwise interfered with and impeded competition.

259.    As a result of the series of sham petitions and unlawful acts perpetuated by Defendants, Plaintiffs have suffered and will continue to suffer antitrust injury in an amount to be proven at trial, including hindering, impeding, delaying, obstructing, and/or preventing Plaintiffs from promptly executing plans for construction of their redevelopment Projects and thereby hindering, impeding, delaying, obstructing, and/or preventing Plaintiffs from realizing the financial benefits of operating their redevelopment Projects while forcing Plaintiffs to, at the same time, continue to pay costs to carry their Properties while being hindered in their ability to attract

capital to finance the Projects on Block 112 and Block 106 and therefore unable to progress with the construction of their redevelopment Projects.

260.    N.J.S.A. 56:9-12 permits suit for treble damages by party whose business or property is injured by anticompetitive conduct.

261.    Plaintiffs' businesses and property were injured by Defendants' anticompetitive conduct in violation of N.J.S.A. 56:9-3 and 15 U.S.C. § 1.

### THIRD COUNT

#### Tortious Interference with Contract

262.    Plaintiffs incorporate by reference all of the allegations previously set forth in this Complaint as if set forth at length herein.

263.    Defendants had actual knowledge of the redevelopment agreements entered into between Plaintiffs and Hoboken.

264.    Defendants had actual knowledge of the Settlements entered into between Plaintiffs and Hoboken.

265.    The acts, conduct, and actions, as well as the inactions, of the Defendants, including their efforts to hinder, impede, delay, obstruct, and/or prevent Plaintiffs from executing their Projects under lawfully granted zoning legislation, represent an interference with the contracts described above.

266.    During all times at which Defendants engaged in their series of sham objections, litigation, and other petitions against the Projects, Defendants had knowledge that their actions would interfere with the contract rights possessed by Plaintiffs, and in fact these actions were done with the intent to interfere with such contract rights.

267.    Defendants engaged in interference with Defendants' contracts for improper and unlawful reasons only, in that they asserted legal claims without regard to their merits for the purpose of impeding the Projects, and in that they sought to privilege their own competing properties in the market and restrain trade.

268.    The intentional and malicious actions and/or inactions of Defendants, individually and/or in concert, to hinder, impede, delay, obstruct, and/or prevent the intended outcomes of the contracts described above, caused damage, injury and harm to Plaintiffs.

269.    Plaintiffs have suffered damages and injury as a direct and proximate result of said interference of the contracts described above, including but not limited to lost financial opportunities directly caused by Defendants' activity, devaluation of their holdings, costs to carry the Properties without expected benefit, and other costs to combat Defendants' abuse of process.

## FOURTH COUNT

### Tortious Interference with Prospective Economic Advantage

270.    At all times material to the facts alleged in this Complaint, Plaintiffs had a reasonable expectation of economic advantage and a protectable interest in their real property interests and in their actual and prospective relationships with Hoboken to redevelop the property in the WERP.

271.    At all times material to the facts alleged in this Complaint, Defendants had actual knowledge and notice of Plaintiffs' reasonable expectation of these economic advantages.

272.    The acts, conduct, and actions as well as the inactions of the Defendants, including their efforts to hinder, impede, delay, obstruct, and/or prevent Plaintiffs from executing their Projects under lawfully granted zoning legislation represent an interference with the prospective economic advantages described above.

273.     During all times at which Defendants engaged in their series of sham objections, litigation, and other petitions against the Projects, Defendants had knowledge that their actions would interfere with the economic rights possessed by Plaintiffs, and in fact were done with the intent to interfere with such prospective economic advantages.

274.     Defendants engaged in interference with Defendants' prospective economic advantages for improper and unlawful reasons only, in that they asserted legal claims without regard to their merits for the purpose of impeding the Projects, and in that they sought to privilege their own competing properties in the market and restrain trade.

275.     The intentional and malicious actions and/or inactions of Defendants, individually and/or in concert, to hinder, impede, delay, obstruct, and/or prevent the proposed redevelopment Projects, caused damage, injury and harm to Plaintiffs.

276.     Plaintiffs have suffered damages and injury as a direct and proximate result of said interference of the prospective economic advantages described above, including, but not limited to ,lost financial opportunities directly caused by Defendants' activity, devaluation of their holdings, costs to carry the Properties without expected benefit, and other costs to combat Defendants' abuse of process.

## FIFTH COUNT

### Malicious Use of Process

277.     Plaintiffs incorporate by reference all of the allegations previously set forth in this Complaint as if set forth at length herein.

278.     Defendants objected to agreements and legislation benefiting Plaintiffs' and filed multiple lawsuits to challenge such agreements and legislation.

73

279.    The agreements and legislation benefiting Plaintiffs were approved and adopted pursuant to the specific processes dictated by the Local Redevelopment and Housing Law and the WERP, whereby specific zoning provisions were enacted in the WERP, Plaintiffs negotiated redevelopment agreements with Hoboken, and Plaintiffs have engaged in the required processes to obtain site plan approvals.

280.    Defendants lacked probable cause to object to agreements, legislation, and approvals regarding the redevelopment Projects because they did not have a reasonable belief that there was a good chance of establishing some or all of their claims seeking invalidate approvals, legislation, or agreements by Hoboken, its City Council, and its Planning Board and/or reversal of the decisions of those bodies.

281.    Defendants made their objections to, and filed their challenges to, the land use legislation and approvals to impede Plaintiffs' ability to execute their redevelopment Projects, without regard for whether the facts and circumstances warranted a legal challenge.

282.    The actions of Defendants were motivated by their malicious desire to illegally and improperly restrain trade and compete with a market rival to privilege their own properties.

283.    Where Defendants' legal objections have reached an outcome, Defendants have to date been unsuccessful.  Defendants' claims in the Original Redevelopment Action were dismissed with prejudice, and Defendants have been denied relief on several other repetitive motions.

284.    Through the course of conduct adopted by Defendants to hinder, impede, delay, obstruct and/or prevent Plaintiffs' attempts to proceed with redevelopment of the Properties with rental housing and other mixed-use development that would compete with Defendants' properties, Plaintiffs have been denied meaningful access to the redevelopment approval process and,

ultimately, the ability to engage in competition in the market for redevelopment projects and rental housing. This interference with Plaintiffs' right to petition constitutes a special grievance.

## SIXTH COUNT

### Civil Conspiracy

285.    Plaintiffs incorporate by reference all of the allegations previously set forth in this Complaint as if set forth at length herein.

286.    Defendants, individually and/or in concert with one another, acted to coordinate efforts and take actions, or purposely avoided taking actions or exercising rights, designed to hinder, impede, delay, interfere, obstruct, and/or stop redevelopment of the projects in the WERA.

287.    Defendants entered into an agreement, whether express or implied, either directly or indirectly, including through their formation of "PCPA" as a vehicle for their objections and their various appearances through counsel in the proceedings before the City Council, Planning Board, and in New Jersey State Court, to hinder, impede, delay, interfere, obstruct, and/or stop redevelopment of projects in the WERA.

288.    In particular, the intent and purpose of the agreement between the Defendants, including their actions taken through "PCPA," was to enable Defendants to take actions as to hinder, impede, delay, interfere, obstruct, and/or stop or otherwise adversely affect the redevelopment of the properties in the WERA, which would also compete or could be in competition with properties owned by Defendants.

289.    In the agreement among Defendants to jointly oppose redevelopment projects in the WERA, there was the combination of two or more persons or entities that acted in concert to commit an improper and unlawful act so as to cause damage, injury and harm to Plaintiffs and/or use unlawful and inequitable means to accomplish the aforesaid objectives.

290.    Defendants agreed either expressly and/or implicitly to each other to do their part to further the aforesaid objectives.

291.    The purpose of this civil conspiracy was to inflict a wrong and injury against Plaintiffs.

292.    Plaintiffs have suffered damages and injury as a result of said civil conspiracy between Defendants and Defendants' overt actions and inactions resulting from their agreement to hinder, impede, delay, interfere, obstruct, and/or stop Plaintiffs' redevelopment of the Properties. These damages are recoverable pursuant to New Jersey law, including, in particular, under the holding of *Banco Popular N. Am. v. Gandi*, 184 N.J. 161 (2005).

293.    Defendants are further liable because they agreed to undertake a scheme to hinder, impede, delay, interfere, obstruct, and/or stop the Projects in violation of the Sherman Act and the New Jersey Antitrust Act, which were predicate unlawful acts furthered by the conspiracy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that the Court:

A.  Enter judgment in its favor and against Plaintiffs on all counts of the Complaint;

B.  Declare Defendants' campaign of repetitive meritless litigation and sham objections to be, in the aggregate, an unlawful restraint on trade;

C.  Award Plaintiffs compensatory and punitive damages;

D.  Award Plaintiffs treble damages pursuant to 15 U.S.C. § 15(a) and N.J.S.A. 56:9-12; and

E.  Award Plaintiffs costs of suit, attorneys' fees, and such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs Just Block 112, LLC and Hoboken Western Edge, LLC hereby demand a trial

by jury in this action of all issues so triable.

Dated:  December 19, 2025          By:   */s/ Charles S. Korschun*
                                                  Charles S. Korschun
                                                  Elena M. Cicognani
                                                  **GIBBONS P.C.**
                                                  One Gateway Center
                                                  Newark, New Jersey 07102
                                                  (973) 596-4413
                                                  ckorschun@gibbonslaw.com
                                                  ecicognani@gibbonslaw.com

                                                  *Attorneys for Plaintiffs Just Block 112, LLC and*
                                                  *Hoboken Western Edge, LLC*